SMITH *v.* WADE

No. 81–1196.   Argued November 10, 1982—Decided April 20, 1983

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-
SHALL, BLACKMUN, and STEVENS, JJ., joined.  REHNQUIST, J., filed a
dissenting opinion, in which BURGER, C. J., and POWELL, J., joined, *post*,
p. 56.  O'CONNOR, J., filed a dissenting opinion, *post*, p. 92.

*Robert Presson* argued the cause for petitioner.  With him
on the brief were *John Ashcroft*, Attorney General of Mis-
souri, and *Paul Robert Otto*, Assistant Attorney General.

*Bradley H. Lockenvitz* argued the cause and filed a brief
for respondent.

JUSTICE BRENNAN delivered the opinion of the Court.

We granted certiorari in this case, 456 U. S. 924 (1982), to
decide whether the District Court for the Western District of
Missouri applied the correct legal standard in instructing the
jury that it might award punitive damages under 42 U. S. C.
§ 1983 (1976 ed., Supp. V).[1]  The Court of Appeals for the
Eighth Circuit sustained the award of punitive damages.
*Wade* v. *Haynes*, 663 F. 2d 778 (1981).  We affirm.

---

[1] Rev. Stat. § 1979, amended, 93 Stat. 1284.  Section 1983 reads in rele-
vant part:

"Every person who, under color of any statute, ordinance, regulation,
custom, or usage, of any State or Territory or the District of Columbia,
subjects, or causes to be subjected, any citizen of the United States or
other person within the jurisdiction thereof to the deprivation of any
rights, privileges, or immunities secured by the Constitution and laws,
shall be liable to the party injured in an action at law, suit in equity, or
other proper proceeding for redress."

## I

The petitioner, William H. Smith, is a guard at Algoa Reformatory, a unit of the Missouri Division of Corrections for youthful first offenders. The respondent, Daniel R. Wade, was assigned to Algoa as an inmate in 1976. In the summer of 1976 Wade voluntarily checked into Algoa's protective custody unit. Because of disciplinary violations during his stay in protective custody, Wade was given a short term in punitive segregation and then transferred to administrative segregation. On the evening of Wade's first day in administrative segregation, he was placed in a cell with another inmate. Later, when Smith came on duty in Wade's dormitory, he placed a third inmate in Wade's cell. According to Wade's testimony, his cellmates harassed, beat, and sexually assaulted him.

Wade brought suit under 42 U. S. C. § 1983 against Smith and four other guards and correctional officials, alleging that his Eighth Amendment rights had been violated. At trial his evidence showed that he had placed himself in protective custody because of prior incidents of violence against him by other inmates. The third prisoner whom Smith added to the cell had been placed in administrative segregation for fighting. Smith had made no effort to find out whether another cell was available; in fact there was another cell in the same dormitory with only one occupant. Further, only a few weeks earlier, another inmate had been beaten to death in the same dormitory during the same shift, while Smith had been on duty. Wade asserted that Smith and the other defendants knew or should have known that an assault against him was likely under the circumstances.

During trial, the District Judge entered a directed verdict for two of the defendants. He instructed the jury that Wade could make out an Eighth Amendment violation only by showing "physical abuse of such base, inhumane and barbaric proportions as to shock the sensibilities." Tr. 639. Further, because of Smith's qualified immunity as a prison

guard, see *Procunier* v. *Navarette*, 434 U. S. 555 (1978), the judge instructed the jury that Wade could recover only if the defendants were guilty of "gross negligence" (defined as "a callous indifference or a thoughtless disregard for the consequences of one's act or failure to act") or "[e]gregious failure to protect" (defined as "a flagrant or remarkably bad failure to protect") Wade. Tr. 641–642. He reiterated that Wade could not recover on a showing of simple negligence. *Id.*, at 644.

The District Judge also charged the jury that it could award punitive damages on a proper showing:

> "In addition to actual damages, the law permits the jury, under certain circumstances, to award the injured person punitive and exemplary damages, in order to punish the wrongdoer for some extraordinary misconduct, and to serve as an example or warning to others not to engage in such conduct.

> "If you find the issues in favor of the plaintiff, and if the conduct of one or more of the defendants is shown to be *a reckless or callous disregard of, or indifference to, the rights or safety of others*, then you may assess punitive or exemplary damages in addition to any award of actual damages.

> ". . . The amount of punitive or exemplary damages assessed against any defendant may be such sum as you believe will serve to punish that defendant and to deter him and others from like conduct." *Id.*, at 643 (emphasis added).

The jury returned verdicts for two of the three remaining defendants. It found Smith liable, however, and awarded $25,000 in compensatory damages and $5,000 in punitive damages. The District Court entered judgment on the verdict, and the Court of Appeals affirmed. *Wade* v. *Haynes*, 663 F. 2d 778 (1981).

In this Court, Smith attacks only the award of punitive damages. He does not challenge the correctness of the in-

structions on liability or qualified immunity, nor does he question the adequacy of the evidence to support the verdict of liability for compensatory damages.

## II

Section 1983 is derived from § 1 of the Civil Rights Act of 1871, 17 Stat. 13. It was intended to create "a species of tort liability" in favor of persons deprived of federally secured rights. *Carey* v. *Piphus*, 435 U. S. 247, 253 (1978); *Imbler* v. *Pachtman*, 424 U. S. 409, 417 (1976). We noted in *Carey* that there was little in the section's legislative history concerning the damages recoverable for this tort liability, 435 U. S., at 255. In the absence of more specific guidance, we looked first to the common law of torts (both modern and as of 1871), with such modification or adaptation as might be necessary to carry out the purpose and policy of the statute. *Id.*, at 253–264. We have done the same in other contexts arising under § 1983, especially the recurring problem of common-law immunities.[2]

---

[2]*Briscoe* v. *LaHue*, 460 U. S. 325 (1983); *Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247 (1981); *Procunier* v. *Navarette*, 434 U. S. 555 (1978); *Imbler* v. *Pachtman*, 424 U. S. 409 (1976); *Wood* v. *Strickland*, 420 U. S. 308 (1975); *Scheuer* v. *Rhodes*, 416 U. S. 232 (1974); *Pierson* v. *Ray*, 386 U. S. 547 (1967); *Tenney* v. *Brandhove*, 341 U. S. 367 (1951).

JUSTICE REHNQUIST's dissent faults us for referring to modern tort decisions in construing § 1983. Its argument rests on the unstated and unsupported premise that Congress necessarily intended to freeze into permanent law whatever principles were current in 1871, rather than to incorporate applicable general legal principles as they evolve. *Post*, at 65–68; see also *post*, at 92–93 (O'CONNOR, J., dissenting). The dissents are correct, of course, that when the language of the section and its legislative history provide no clear answer, we have found useful guidance in the law prevailing at the time when § 1983 was enacted; but it does not follow that that law is absolutely controlling, or that current law is irrelevant. On the contrary, if the prevailing view on some point of general tort law had changed substantially in the intervening century (which is not the case here), we might be highly reluctant to assume that Congress intended to perpetuate a now-obsolete doctrine. See *Carey* v. *Piphus*, 435 U. S. 247,

Smith correctly concedes that "punitive damages are available in a 'proper' § 1983 action . . . ." *Carlson* v. *Green,* 446 U. S. 14, 22 (1980); Brief for Petitioner 8. Although there was debate about the theoretical correctness of the punitive damages doctrine in the latter part of the last century, the doctrine was accepted as settled law by nearly all state and federal courts, including this Court.[3] It was likewise generally established that individual public officers were liable for punitive damages for their misconduct on the same basis as other individual defendants.[4] See also *Scott* v. *Donald,* 165 U. S. 58, 77–89 (1897) (punitive damages for constitutional tort). Further, although the precise issue of the availability of punitive damages under § 1983 has never come squarely

_____

257–258 (1978) ("[O]ver the centuries the common law of torts has developed a set of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of his legal rights. These rules, defining the elements of damages and the prerequisites for their recovery, provide the appropriate starting point for the inquiry under § 1983 as well") (footnote omitted); *Adickes* v. *S. H. Kress & Co.,* 398 U. S. 144, 231–232 (1970) (BRENNAN, J., concurring and dissenting); *Pierson, supra,* at 555 (citing modern authority for "the prevailing view in this country"); *Wood, supra,* at 318–319, and n. 9; *Tenney, supra,* at 375, and n. 5. Indeed, in *Imbler* we recognized a common-law immunity that first came into existence 25 years after § 1983 was enacted, 424 U. S., at 421–422. Under the dissents' view, *Imbler* was wrongly decided.

[3] See, *e. g.,* the cases cited in nn. 8 and 12, *infra; Day* v. *Woodworth,* 13 How. 363 (1852); *Philadelphia, W. & B. R. Co.* v. *Quigley,* 21 How. 202 (1859); *Milwaukee & St. Paul R. Co.* v. *Arms,* 91 U. S. 489 (1876); *Missouri Pacific R. Co.* v. *Humes,* 115 U. S. 512 (1885); *Barry* v. *Edmunds,* 116 U. S. 550 (1886); *Minneapolis & St. Louis R. Co.* v. *Beckwith,* 129 U. S. 26 (1889); *Scott* v. *Donald,* 165 U. S. 58 (1897).

[4] *E. g., Nightingale* v. *Scannell,* 18 Cal. 315, 324–326 (1861); *Friend* v. *Hamill,* 34 Md. 298, 314 (1871); *Lynd* v. *Picket,* 7 Minn. 184, 200–202 (1862); *Parker* v. *Shackelford,* 61 Mo. 68, 72 (1875); *Rodgers* v. *Ferguson,* 36 Tex. 544 (1871); see, *e. g., Stinson* v. *Buisson,* 17 La. 567, 572–573 (1841); *Nagle* v. *Mullison,* 34 Pa. 48 (1859); *Von Storch* v. *Winslow,* 13 R. I. 23, 24–25 (1880). Cf. *Brewer* v. *Watson,* 71 Ala. 299, 307 (1882). See also, *e. g., Lane* v. *Yamamoto,* 2 Haw. App. 176, 628 P. 2d 634 (1981); *Wilson* v. *Eagan,* 297 N. W. 2d 146, 148–150 (Minn. 1980).

before us, we have had occasion more than once to make clear our view that they are available; indeed, we have rested decisions on related questions on the premise of such availability.[5]

---

[5] In *Newport* v. *Fact Concerts, Inc., supra,* for example, we held that a municipality (as opposed to an individual defendant) is immune from liability for punitive damages under § 1983. A significant part of our reasoning was that deterrence of constitutional violations would be adequately accomplished by allowing punitive damages awards directly against the responsible individuals:

"Moreover, there is available a more effective means of deterrence. By allowing juries and courts to assess punitive damages in appropriate circumstances against the offending official, based on his personal financial resources, the statute [§ 1983] directly advances the public's interest in preventing repeated constitutional deprivations. In our view, this provides sufficient protection against the prospect that a public official may commit recurrent constitutional violations by reason of his office." *Id.,* at 269–270 (footnote omitted).

Similarly, in *Carlson* v. *Green,* 446 U. S. 14 (1980), we stated that punitive damages would be available in an action against federal officials directly under the Eighth Amendment, partly on the reasoning that since such damages are available under § 1983, it would be anomalous to allow punitive awards against state officers but not federal ones. *Id.,* at 22, and n. 9. See also *Adickes* v. *S. H. Kress & Co., supra,* at 233 (BRENNAN, J., concurring and dissenting); *Carey* v. *Piphus, supra,* at 257, n. 11; *Johnson* v. *Railway Express Agency, Inc.,* 421 U. S. 454, 460 (1975) (punitive damages available under 42 U. S. C. § 1981).

JUSTICE REHNQUIST's dissent, without squarely denying that punitive damages are available under § 1983, does its best to cast doubt on the proposition. It argues that the phrase "for redress" at the end of the section means that Congress intended to limit recovery to compensatory damages. *Post,* at 85; see n. 1, *supra.* This novel construction is strained; a more plausible reading of the statute is that the phrase "or other proper proceeding for redress" is simply an expansive alternative to the preceding phrases "action at law" and "suit in equity," intended to avoid any unwanted technical limitations that might lurk in the other phrases.

Next JUSTICE REHNQUIST points to two other statutes enacted in 1863 and 1870 that provided expressly for punitive remedies. *Post,* at 85–86. Neither of these statutes enacted a punitive damages remedy as such, although they did create other forms of punitive civil remedies. The Act of March 2, 1863, § 3, 12 Stat. 698, created a civil fine for fraudulent military claims, apparently intended to stimulate suit by private attorneys general.

Smith argues, nonetheless, that this was not a "proper" case in which to award punitive damages.   More particularly, he attacks the instruction that punitive damages could be awarded on a finding of reckless or callous disregard of or indifference to Wade's rights or safety.   Instead, he contends that the proper test is one of actual malicious intent— "ill will, spite, or intent to injure."[6]   Brief for Petitioner 9.

The Act of July 8, 1870, § 59, 16 Stat. 207, was the treble damages provision of the revised patent code.   These statutes do not support JUSTICE REHNQUIST's speculation that Congress acted expressly when it intended to approve punitive damages, since both statutes created new remedies not available at common law; moreover, they undercut his argument that Congress was hostile to punitive civil remedies in favor of private parties.

Finally, JUSTICE REHNQUIST argues that Congress would not likely have approved "this often-condemned doctrine" in the 1871 Civil Rights Act.   *Post*, at 84.   This speculation is remarkable, to say the least, given that Congress did approve a punitive civil remedy in an 1870 Civil Rights Act.   Act of May 31, 1870, § 2, 16 Stat. 140 (creating private cause of action for fixed penalty on behalf of persons suffering racial discrimination in voting registration).   Cf. 1889 Colo. Sess. Laws 64 (enacting punitive damages statute, including awards for "wanton and reckless disregard," five years after state court held against doctrine).   At any rate, the punitive damages debate, though lively, was by no means one-sided.   See, e. g., *Missouri Pacific R. Co.* v. *Humes, supra*, at 521–523; *Linsley* v. *Bushnell*, 15 Conn. 225, 235–237 (1842); *Frink & Co.* v. *Coe*, 4 Greene 555, 559–560 (Iowa 1854); *Chiles* v. *Drake*, 59 Ky. 146, 152–153 (1859); *Lynd* v. *Picket, supra*, at 200–201; *Taylor* v. *Grand Trunk R. Co.*, 48 N. H. 304, 320 (1869), overruled, *Fay* v. *Parker*, 53 N. H. 342 (1872); *Mayer* v. *Frobe*, 40 W. Va. 246, 22 S. E. 58 (1895); *Cosgriff Brothers* v. *Miller*, 10 Wyo. 190, 236–237, 68 P. 206, 216–217 (1902).   See also *Tillotson* v. *Cheetham*, 3 Johns. 56, 63–64 (N. Y. 1808) (Kent, C. J.).

[6] Smith uses the term "actual malice" to refer to the standard he would apply.   While the term may be an appropriate one, we prefer not to use it, simply to avoid the confusion and ambiguity that surrounds the word "malice."   See n. 8, *infra*.   Indeed, as Smith recognizes, this Court has used the very term "actual malice" in the defamation context to refer to a recklessness standard.   Brief for Petitioner 8–9; see *Cantrell* v. *Forest City Publishing Co.*, 419 U. S. 245, 251–252 (1974); *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 280 (1964).

We note in passing that it appears quite uncertain whether even JUSTICE REHNQUIST's dissent ultimately agrees with Smith's view that "ill will, spite, or intent to injure" should be required to allow punitive damages

He offers two arguments for this position: first, that actual intent is the proper standard for punitive damages in all cases under § 1983; and second, that even if intent is not always required, it should be required here because the threshold for punitive damages should always be higher than that for liability in the first instance. We address these in turn.

## III

Smith does not argue that the common law, either in 1871 or now, required or requires a showing of actual malicious in-

awards. JUSTICE REHNQUIST consistently confuses, and attempts to blend together, the quite distinct concepts of *intent to cause* injury, on one hand, and *subjective consciousness* of risk of injury (or of unlawfulness) on the other. For instance, his dissent purports to base its analysis on the "fundamental distinction" between "wrongful motive, actual intention to inflict harm *or intentional doing of an act known to be unlawful*," versus "very careless or negligent conduct," *post*, at 60–61 (emphasis added). Yet in the same paragraph, the dissent inaccurately recharacterizes the first element of this distinction as "acts that are intentionally harmful," requiring "inquiry into the actor's subjective motive and purpose." *Post*, at 63–64. Consciousness of consequences or of wrongdoing, of course, does not require injurious intent or motive; it is equally consistent with indifference toward or disregard for consequences. This confusion of standards continues throughout the opinion. JUSTICE REHNQUIST's dissent frequently uses such phrases as "intent to injure" or "evil motive"; yet at several points it refers more broadly to "subjective mental state" or like phrases, and expressly includes consciousness (as opposed to intent) in its reasoning. *Post*, at 63, n. 3, 71–72, n. 7, 72–73. More telling, perhaps, is its citation of cases and treatises, which frequently and consistently includes authority supporting (at most) a consciousness requirement rather than the "actual intent" standard for which the opinion purports to argue elsewhere. See, *e. g., post*, at 76–77, n. 10, 78–84, n. 12.

If JUSTICE REHNQUIST does indeed mean to propose a standard reaching subjective consciousness as well as actual injurious intent, one wonders why the instructions given in this case, *supra*, at 33, do not meet his standard. It is hard to see how Smith could have disregarded or been indifferent to the danger to Wade unless he was subjectively conscious of that danger. If JUSTICE REHNQUIST stands by his "fundamental distinction" and his use of authority, then, he has no apparent reason to dissent from our judgment.

tent for recovery of punitive damages.   See Tr. of Oral Arg. 5–6, 9.[7]

Perhaps not surprisingly, there was significant variation (both terminological and substantive) among American jurisdictions in the latter 19th century on the precise standard to be applied in awarding punitive damages—variation that was exacerbated by the ambiguity and slipperiness of such common terms as "malice" and "gross negligence."[8]   Most of the

---

[7] Indeed, the District Judge's instruction on punitive damages in this case was drawn with only slight alteration from a standard jury instruction manual under Missouri state law.   See Tr. 576–577; Tr. of Oral Arg. 9, 42–43.

[8] This terminological difficulty seems to be responsible in some degree for the dissent's error in asserting that intent was the majority rule in 1871, *post*, at 68–84.   In particular, the dissent argues that "malice," "wantonness," and "willfulness" denoted actual ill will or intent to cause injury. See nn. 10, 12, *infra; post*, at 60–64, n. 3, 73, n. 8, 76–77, n. 10, 78–84, n. 12.   See also n. 6, *supra* (dissent's confusion of knowledge with intent); n. 9, *infra* (concerning "criminal indifference").   With regard to "malice," the assumption is dubious at best; with regard to "wantonness" and "willfulness," it is just plain wrong.

"Malice," as used by courts and lawyers in the last century, was a hopelessly versatile and ambiguous term, carrying a broad spectrum of meanings.   See generally, *e. g.*, 2 J. Sutherland, Law of Damages § 394 (3d ed. J. Berryman, 1903); 25 Cyclopedia of Law and Procedure 1666–1669 (1907). As the dissent correctly states, *post*, at 60–64, n. 3, in some instances (especially when it was modified by terms such as "actual" or "express," or in criminal law, where terms were generally more strictly construed than in civil law), it meant what the dissent says it meant—actual ill will, spite, or intent to injure.   On the other extreme, in tort law, it was often used without modification to mean what was sometimes called "implied malice"—a purely fictional malice that was conclusively presumed to exist whenever a tort resulted from a voluntary act, even if no harm was intended.   The term was sometimes, though not often, used in this fictional sense as a ground for punitive damages.   *E. g.*, *Childers* v. *San Jose Mercury Printing & Publishing Co.*, 105 Cal. 284, 289, 38 P. 903, 904–905 (1894).   In other cases it was explained to mean an intent to do the act that caused the injury, as opposed to intent to cause the injury itself.   *E. g.*, *Goetz* v. *Ambs*, 27 Mo. 28, 32–33 (1858).   More commonly in the punitive damages context, the term meant something in between fictional malice and actual injurious

40

confusion, however, seems to have been over the degree of negligence, recklessness, carelessness, or culpable indifference that should be required—not over whether actual intent

---

intent—"that form of malice . . . where, without 'deliberate mind' or 'formed design,' the offender has been so grossly and recklessly negligent, so wantonly indifferent to another's rights, that he should be required to pay damages in excess of mere compensation as a punishment and example." *Press Pub. Co.* v. *McDonald*, 63 F. 238, 246 (CA2 1894). Accord, *e. g., Philadelphia, W. & B. R. Co.* v. *Quigley*, 21 How. 202, 214 (1859); *South & N. A. R. Co.* v. *McLendon*, 63 Ala. 266, 273–275 (1879); *Yerian* v. *Linkletter*, 80 Cal. 135, 138, 22 P. 70, 71 (1889) (Paterson, J., concurring); *Cameron* v. *Bryan*, 89 Iowa 214, 219, 56 N. W. 434 (1893); *Lynd* v. *Picket*, 7 Minn., at 200–202.

There was considerably less ambiguity or confusion concerning the meaning of "wantonness" in tort law:

"Wanton means reckless—without regard to the rights of others. . . . Wantonly means causelessly, without restraint, and in reckless disregard of the rights of others. Wantonness is defined as a licentious act of one man towards the person of another, without regard to his rights; it has also been defined as the conscious failure by one charged with a duty to exercise due care and diligence to prevent an injury after the discovery of the peril, or under circumstances where he is charged with a knowledge of such peril, and being conscious of the inevitable or probable results of such failure." 30 American and English Encyclopedia of Law 2–4 (2d ed. 1905) (footnotes omitted).

The last sentence of that definition could have been written with this case in mind. See also, *e. g.*, 40 Cyclopedia of Law and Procedure 292–295 (1912). The word was used with the same meaning in the punitive damages context. See, *e. g., Texarkana Gas & Electric Light Co.* v. *Orr,* 59 Ark. 215, 224, 27 S. W. 66, 68 (1894); *Welch* v. *Durand*, 36 Conn. 182, 184–185 (1869); *Southern Kansas R. Co.* v. *Rice*, 38 Kan. 398, 403–404, 16 P. 817, 820 (1888).

Finally, "willfulness" did not mean intent to cause injury, but only voluntary action:

"Wilful . . . generally, as used in courts of law, implies nothing blamable, but merely that the person of whose action or default the expression is used is a free agent, and that what has been done arises from the spontaneous action of his will. It amounts to nothing more than this: that he knows what he is doing, and intends to do what he is doing, and is a free agent. And wilfully does not imply that an act done in that spirit was necessarily a malicious act. . . ." 30 American and English Encyclopedia of Law 529–530 (2d ed. 1905) (footnote omitted).

was essential. On the contrary, the rule in a large majority of jurisdictions was that punitive damages (also called exemplary damages, vindictive damages, or smart money) could be awarded without a showing of actual ill will, spite, or intent to injure.

This Court so stated on several occasions, before and shortly after 1871. In *Philadelphia, W. & B. R. Co.* v. *Quigley*, 21 How. 202 (1859), a diversity libel suit, the Court held erroneous an instruction that authorized the jury to return a punitive award but gave the jury virtually no substantive guidance as to the proper threshold. We described the standard thus:

> "Whenever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved person. But the malice spoken of in this rule is not merely the doing of an unlawful or injurious act. The word implies that the act complained of was conceived in the spirit of mischief, *or of criminal indifference to civil obligations.*" *Id.*, at 214 (emphasis added).[9]

"Wilful neglect or negligence has been defined as that degree of neglect arising where there is a reckless indifference to the safety of human life, or an intentional failure to perform á manifest duty to the public, in the performance of which the public and the party injured had an interest." *Id.*, at 535 (footnote omitted).

See also, *e. g.*, 40 Cyclopedia of Law and Procedure 944–947 (1912). Again, the punitive damages cases bear this reading out. *Cameron, supra*, at 219, 56 N. W., at 434; *Goetz, supra*, at 32–33; *Chiles* v. *Drake*, 59 Ky., at 152–155; *Peoria Bridge Assn.* v. *Loomis*, 20 Ill. 235, 251 (1858).

[9] JUSTICE REHNQUIST's dissent reads this statement as a requirement of actual intent, *post*, at 68–69. This misreading depends in part on the faulty assumption, see n. 8, *supra*, that "malice" always meant intent to injure (*post*, at 68)—a reading particularly inappropriate in light of the Court's express definition of malice as including "criminal indifference." As for the latter point, JUSTICE REHNQUIST reasons that the term "criminal indifference" must include an element of actual malicious intent. This surprising interpretation of the word "indifference" rests on the unstated

The Court further explained the standard for punitive damages in *Milwaukee & St. Paul R. Co.* v. *Arms*, 91 U. S. 489 (1876), a diversity railroad collision case:

> "Redress commensurate to such [personal] injuries should be afforded. In ascertaining its extent, the jury may consider all the facts which relate to the wrongful act of the defendant, and its consequences to the plaintiff; but they are not at liberty to go farther, unless it was done wilfully, *or was the result of that reckless indifference to the rights of others which is equivalent to an intentional violation of them.* In that case, the jury are authorized, for the sake of public example, to give such additional damages as the circumstances require. The tort is aggravated by the evil motive, and on this rests the rule of exemplary damages." *Id.*, at 493.
>
> " . . . To [assess punitive damages], there must have been some wilful misconduct, *or that entire want of care*

---

and demonstrably false premise that intent to cause injury was always an element of crime. Not only were there crimes of recklessness or negligence (such as reckless homicide), but even crimes of intent commonly required only intent to do the criminal act (and, in some cases, knowledge that the injury would likely follow), rather than actual ill will or purpose to inflict an injury. See, *e. g.*, 1 J. Bishop, Commentaries on Criminal Law §§ 313–322 (5th ed. 1872); J. May, Law of Crimes §§ 30, 31, 232, 233 (2d ed. J. Beale, 1893); see also, *e. g.*, Model Penal Code § 2.02 (Tent. Draft No. 4, 1955). The case law clearly illustrates that "criminal" did not mean "with injurious intent" in the punitive damages context. *E. g.*, *Hopkins* v. *Atlantic & St. L. R. Co.*, 36 N. H. 9, 18–19 (1857), overruled on other grounds, *Fay* v. *Parker*, 53 N. H. 342 (1872); *Brooke* v. *Clark*, 57 Tex. 105, 112–114 (1880); *Meibus* v. *Dodge*, 38 Wis. 300, 310–311 (1875).

JUSTICE REHNQUIST also cites *Day* v. *Woodworth*, 13 How. 363, 371 (1852), in support of an actual-intent requirement. *Post*, at 70. The language used in that case ("wanton and malicious, or gross and outrageous") was precisely the precedent that the *Philadelphia* Court was exegeting in the passage quoted in text, when it held that "malice" includes "criminal indifference." Moreover, the *Day* case did not present any issue of punitive damages; the Court discussed them merely as a sidelight to the costs-and-fees issue presented.

*which would raise the presumption of a conscious indif-
ference to consequences." Id.,* at 495 (emphasis added).

The Court therefore held erroneous a jury instruction allow-
ing a punitive award on "gross negligence"; it concluded that
the latter term was too vague, and too likely to be confused
with mere ordinary negligence, to provide a fair standard.
It remanded for a new trial.[10]

---

[10] As with *Philadelphia,* n. 9, *supra,* JUSTICE REHNQUIST's dissent reads
this case as imposing a requirement of actual malicious intent, on the as-
sumption that when the Court said "indifference to consequences" it really
meant "intent to cause consequences," and when it said "recklessness" it
really meant "bad motive or intent to injure." *Post,* at 70–73. This
textual alchemy is untenable. For one thing, JUSTICE REHNQUIST's anal-
ysis of the case reflects the confusion in his dissent of motive with con-
sciousness, see n. 6, *supra; post,* at 71–72, n. 7. Moreover, the *Milwaukee*
Court did not say, or come close to saying, that recklessness is *identical* to
intent, or that it is material only as *evidence* of intent; rather, it said that
recklessness is *"equivalent"* to intent, meaning that the two are equally
culpable and deserving of punishment and deterrence. 91 U. S., at 493.
This also explains the Court's reference, two sentences later, to "evil mo-
tive," *ibid.* JUSTICE REHNQUIST's great reliance on this sentence con-
fuses the *standard* for punitive damages with the *rationale* for them.
Plainly, read in context, what the Court meant is that punitive damages
are justified by the moral culpability of evil intent, or by the "equivalent"
culpability of "reckless indifference to the rights of others." See also
*Cowen* v. *Winters,* 96 F. 929, 934–935 (CA6 1899); *Alabama G. S. R. Co.* v.
*Hill,* 90 Ala. 71, 80, 8 So. 90, 93 (1890); *Memphis & C. R. Co.* v. *Whitfield,*
44 Miss. 466, 494–495 (1870); *Thirkfield* v. *Mountain View Cemetery
Assn.,* 12 Utah 76, 82, 41 P. 564, 565 (1895). The contrary reading
adopted by JUSTICE REHNQUIST's dissent is flatly inconsistent with the
Court's reiteration of the rule, 91 U. S., at 495 (emphasis added): "that en-
tire want of care which would raise the presumption of a *conscious indiffer-
ence to consequences."* Try as he might, JUSTICE REHNQUIST cannot
transform indifference, conscious or otherwise, into intent.

JUSTICE REHNQUIST also relies on a four-sentence capsulization by the
Reporter of Decisions of our unreported decision in *Western Union Tele-
graph Co.* v. *Eyser,* 91 U. S. 495, decided the same day. While the Re-
porter's summary does speak of the absence of "intentional wrong," *id.,* at
496, the factual context suggests that the basis of decision was the jury in-
struction that ordinary negligence would warrant punitive damages, com-

Ten years later, the Court in dictum suggested that perhaps even gross negligence would suffice after all, at least in some cases:

"For injuries resulting from a neglect of duties, in the discharge of which the public is interested, juries are also permitted to assess exemplary damages. These may be perhaps considered as falling under the head of cases of gross negligence, for any neglect of duties imposed for the protection of life or property is culpable, and deserves punishment." *Missouri Pacific R. Co.* v. *Humes*, 115 U. S. 512, 521 (1885).

See also *Minneapolis & St. Louis R. Co.* v. *Beckwith*, 129 U. S. 26, 34 (1889) ("culpable negligence").[11]

---

bined with the fact that the defendant had taken some affirmative (though insufficient) steps to avoid injury to passersby. Thus, in context, the reference to "intentional wrong" is entirely consistent with the *Milwaukee* decision's test of "conscious indifference"; the defendant in *Western Union* was not indifferent to injury, but instead plainly intended to *avoid* injury.

[11] In two other cases the Court reaffirmed the *Philadelphia* "criminal indifference" standard and the *Milwaukee* "reckless indifference" standard. *Barry* v. *Edmunds*, 116 U. S., at 563; *Denver & R. G. R. Co.* v. *Harris*, 122 U. S. 597, 609–610 (1887).

JUSTICE REHNQUIST's dissent relies on two later decisions of this Court, neither of which supports it. *Post*, at 74–75. In *Lake Shore & M. S. R. Co.* v. *Prentice*, 147 U. S. 101 (1893), the issue was whether a corporation could be liable in punitive damages for the tort of its employee. The Court, reasoning largely from general principles of *respondeat superior*, held that such vicarious liability could exist only when the employer had authorized or ratified the tort. In so doing, however, it expressly reaffirmed as "well settled" the general standard announced in the *Philadelphia* case, including liability for "criminal indifference." 147 U. S., at 107. JUSTICE REHNQUIST cites a passage quoting from one state case suggesting an intent requirement, *post*, at 74, but he omits to mention the court's extensive quotations from *Philadelphia* and *Milwaukee*, 147 U. S., at 112–113, and its express approval of and quotation from other state cases stating unequivocally that an employer can be liable for its own recklessness in hiring unfit employees, *id.*, at 114–116. See also n. 9, *supra*. In *Scott* v. *Donald*, 165 U. S., at 71–90, the issue was whether there was a sufficient amount in controversy. The Court held that allegations of

The large majority of state and lower federal courts were in agreement that punitive damages awards did not require a showing of actual malicious intent; they permitted punitive awards on variously stated standards of negligence, recklessness, or other culpable conduct short of actual malicious intent.[12]

---

"intentional, malicious and repeated interference" with federally protected rights, *id.*, at 89, were enough, if proved, to warrant punitive damages. The Court undertook no statement of a general standard for punitive damages beyond noting the unsurprising principle that such damages are awardable on proof of actual evil motive, *id.*, at 86. Under the allegations, of course, no question of liability for less culpable conduct was presented.

[12] In the often-cited case of *Welch* v. *Durand*, 36 Conn. 182 (1869), for example, the court held that punitive damages were proper where the defendant's pistol bullet, fired at a target, ricocheted and hit the plaintiff:

"In what cases then may smart money be awarded in addition to the damages? The proper answer to this question . . . seems to be, in actions of tort founded on the malicious or wanton misconduct or culpable neglect of the defendant. . . .

"In this case the defendant was guilty of wanton misconduct and culpable neglect. . . . It is an immaterial fact that the injury was unintentional, and that the ball glanced from the intended direction. . . . [I]f the act is done where there are objects from which the balls may glance and endanger others, the act is wanton, reckless, without due care, and grossly negligent." *Id.*, at 185.

In *Frink & Co.* v. *Coe*, 4 Greene 555 (Iowa 1854), punitive damages were awarded against a stage company for employing a known drunkard as a driver, the court saying:

"In a case of gross negligence on the part of a stage proprietor, such as the employment of a known drunken driver, and where a passenger has been injured in consequence of such negligence, we think exemplary damages should be entertained.

.        .        .        .        .

"If a stage proprietor or carrier is guilty of gross negligence, it amounts to that kind of gross misconduct which will justify a jury in giving exemplary damages, even where an *'intent or design'* to do the injury does not appear." *Id.*, at 559 (emphasis in original).

*Maysville & Lexington R. Co.* v. *Herrick*, 76 Ky. 122 (1877), held that the trial court correctly refused to instruct the jury that "willful or intentional

The same rule applies today.   The Restatement (Second) of Torts (1979), for example, states: "Punitive damages may be awarded for conduct that is outrageous, because of the de-

---

wrong" was required to award punitive damages in a railroad accident case, remarking:

"The absence of slight care in the management of a railroad train, or in keeping a railroad track in repair, is gross negligence; and to enable a passenger to recover punitive damages, in a case like this, it is not necessary to show the absence of all care, or 'reckless indifference to the safety of . . . passengers,' or 'intentional misconduct' on the part of the agents and officers of the company."   *Id.*, at 127 (ellipsis in original).

Accord, *e. g., Cowen* v. *Winters,* 96 F., at 934–935; *Press Pub. Co.* v. *McDonald,* 63 F., at 245–247; *Morning Journal Assn.* v. *Rutherford,* 51 F. 513, 514–515 (CA2 1892); *Fotheringham* v. *Adams Express Co.,* 36 F. 252, 253–254 (CC ED Mo. 1888); *United States* v. *Taylor,* 35 F. 484, 488 (CC SD Ala. 1888); *Malloy* v. *Bennett,* 15 F. 371, 373–374 (CC SDNY 1883); *Berry* v. *Fletcher,* 3 F. Cas. 286, 288 (No. 1,357) (CC Mo. 1870); *Alabama G. S. R. Co.* v. *Arnold,* 80 Ala. 600, 608, 2 So. 337, 342 (1886); *Texarkana Gas & Electric Light Co.* v. *Orr,* 59 Ark., at 224, 27 S. W., at 68; *Dorsey* v. *Manlove,* 14 Cal. 553, 555–556 (1860); *Florida Railway & Navigation Co.* v. *Webster,* 25 Fla. 394, 419–420, 5 So. 714, 719 (1889); *Jacobus* v. *Congregation of Children of Israel,* 107 Ga. 518, 521, 33 S. E. 853, 855 (1899); *Drohn* v. *Brewer,* 77 Ill. 280, 282–283 (1875); *Citizens' St. R. Co.* v. *Willoeby,* 134 Ind. 563, 569–570, 33 N. E. 627, 629 (1893); *Sawyer* v. *Sauer,* 10 Kan. 466, 470 (1872); *Goddard* v. *Grand Trunk R. Co.,* 57 Me. 202, 218 (1869); *Lynd* v. *Picket,* 7 Minn., at 200–202; *Memphis & C. R. Co.* v. *Whitfield,* 44 Miss., at 494–495, 500; *Buckley* v. *Knapp,* 48 Mo. 152, 161–162 (1871); *Caldwell* v. *New Jersey Steamboat Co.,* 47 N. Y. 282, 296 (1872); *Sullivan* v. *Oregon Railway & Navigation Co.,* 12 Ore. 392, 404–406, 7 P. 508, 517 (1885) (dictum); *Lake Shore & M. S. R. Co.* v. *Rosenzweig,* 113 Pa. 519, 543–544, 6 A. 545, 552–553 (1886); *Hart* v. *Charlotte, C. & A. R. Co.,* 33 S. C. 427, 435–436, 12 S. E. 9, 10 (1890); *Haley* v. *Mobile & O. R. Co.,* 66 Tenn. 239, 242–243 (1874); *Brooke* v. *Clark,* 57 Tex., at 112–114; *Thirkfield* v. *Mountain View Cemetery Assn.,* 12 Utah, at 82, 41 P., at 564–565; *Earl* v. *Tupper,* 45 Vt. 275, 286–287 (1873) (dictum); *Borland* v. *Barrett,* 76 Va. 128, 132–134 (1882); *Pickett* v. *Crook,* 20 Wis. 358, 359 (1866); *Union Pacific R. Co.* v. *Hause,* 1 Wyo. 27, 35 (1871). JUSTICE REHNQUIST's assertion that a "solid majority of jurisdictions" required actual malicious intent, *post,* at 84, is simply untrue.   In fact, there were fairly few jurisdictions that imposed such a requirement, and fewer yet that adhered to it consistently.   JUSTICE REHNQUIST's attempt

fendant's evil motive *or his reckless indifference to the rights of others."* § 908(2) (emphasis added); see also *id.*, Comment *b.* Most cases under state common law, although varying in

---

to establish this proposition with case citations, *post,* at 78–84, n. 12, does not offer him substantial support. Because the point is not of controlling significance, see n. 2, *supra,* we will not tarry here to analyze his citations case-by-case or State-by-State, but will only summarize the main themes.

Several of JUSTICE REHNQUIST's cases actually offer unequivocal support for the rule that punitive damages are available on a showing of negligence, recklessness, disregard for or indifference to the rights of others, and various other standards short of actual ill will or injurious intent. In this same vein, JUSTICE REHNQUIST continues to try to equate consciousness or knowledge with actual ill will or intent to injure, see n. 6, *supra.*

Other cases do not clearly support either JUSTICE REHNQUIST's view or ours. Some of these contain contradictory language in their formulations, indicating that the present distinction perhaps did not occur to the writers. Others support JUSTICE REHNQUIST's rule only if one makes the questionable assumption, see nn. 8, 9, *supra,* that terms like "malice," "wantonness," and "criminal" always meant actual intent to injure. Still others simply ruled on collateral questions (such as the admissibility of evidence of bad motive or of good faith) without purporting to state any general standard for punitive damages. Some were apparently limited to particular classes of torts. A comparison of this class of cases with those cited *supra,* this note, reveals that in many instances other decisions of the same courts clear up any ambiguity in favor of a recklessness or negligence standard.

A third class of cases are those in which the courts simply affirmed awards of punitive damages based on evidence of, or jury instructions requiring, actual malicious intent, without discussing whether a lesser showing might also be adequate. Often the cases in this category involved assault and battery or similar torts, where the facts presented little problem of negligence or recklessness. See also n. 11, *supra.* As with the previous category, many of the same courts spoke more directly in other cases, making it clear that injurious intent was *not* required.

Finally, even of those comparatively few cases that do seem to support JUSTICE REHNQUIST's view, many are of debatable authority. In nearly every State there was at least some late 19th-century authority supporting awards on less than ill will or intent to injure. Admittedly, in a few States this was the less accepted view, but in a substantial majority of jurisdictions the prevailing rule (as evidenced by the cases cited *supra,* this note, and numerous other cases not listed here) was that no such actual malicious intent was required.

their precise terminology, have adopted more or less the same rule, recognizing that punitive damages in tort cases may be awarded not only for actual intent to injure or evil motive, but also for recklessness, serious indifference to or disregard for the rights of others, or even gross negligence.[13]

The remaining question is whether the policies and purposes of § 1983 itself require a departure from the rules of tort common law. As a general matter, we discern no reason why a person whose federally guaranteed rights have

[13] *Loch Ridge Construction Corp.* v. *Barra*, 291 Ala. 312, 280 So. 2d 745 (1973); *Sturm, Ruger & Co.* v. *Day*, 594 P. 2d 38 (Alaska 1979), modified on other grounds, 615 P. 2d 621 (1980), and 627 P. 2d 204 (1981); *Huggins* v. *Deinhard*, 127 Ariz. 358, 621 P. 2d 45 (App. 1980); *White* v. *Brock*, 41 Colo. App. 156, 584 P. 2d 1224 (1978); *Collens* v. *New Canaan Water Co.*, 155 Conn. 477, 234 A. 2d 825 (1967); *Sheats* v. *Bowen*, 318 F. Supp. 640 (Del. 1970) (Delaware law); *Spar* v. *Obwoya*, 369 A. 2d 173 (D. C. 1977); *Adams* v. *Whitfield*, 290 So. 2d 49 (Fla. 1974); *Randall* v. *Ganz*, 96 Idaho 785, 537 P. 2d 65 (1975); *Pendowski* v. *Patent Scaffolding Co.*, 89 Ill. App. 3d 484, 411 N. E. 2d 910 (1980), appeal denied (Ill. 1981); *Meyer* v. *Nottger*, 241 N. W. 2d 911 (Iowa 1976); *Ford* v. *Guarantee Abstract & Title Co.*, 220 Kan. 244, 553 P. 2d 254 (1976); *Pettengill* v. *Turo*, 159 Me. 350, 193 A. 2d 367 (1963); *American Laundry Machine Industries* v. *Horan*, 45 Md. App. 97, 412 A. 2d 407 (1980); *Bailey* v. *Graves*, 411 Mich. 510, 309 N. W. 2d 166 (1981); *Huebsch* v. *Larson*, 291 Minn. 361, 191 N. W. 2d 433 (1971); *Mississippi Power Co.* v. *Jones*, 369 So.' 2d 1381 (Miss. 1979); *Stenson* v. *Laclede Gas Co.*, 553 S. W. 2d 309 (Mo. App. 1977); *Butcher* v. *Petranek*, 181 Mont. 358, 593 P. 2d 743 (1979); *Berg* v. *Reaction Motors Division*, 37 N. J. 396, 181 A. 2d 487 (1962); *Robison* v. *Katz*, 94 N. M. 314, 610 P. 2d 201 (App.), cert. denied, 94 N. M. 675, 615 P. 2d 992 (1980); *Soucy* v. *Greyhound Corp.*, 27 App. Div. 2d 112, 276 N. Y. S. 2d 173 (1967); *Newton* v. *Standard Fire Insurance Co.*, 291 N. C. 105, 229 S. E. 2d 297 (1976); *Dahlen* v. *Landis*, 314 N. W. 2d 63 (N. D. 1981); *Leichtamer* v. *American Motors Corp.*, 67 Ohio St. 2d 456, 424 N. E. 2d 568 (1981); *Smith* v. *Johnston*, 591 P. 2d 1260 (Okla. 1978); *Focht* v. *Rabada*, 217 Pa. Super. 35, 268 A. 2d 157 (1970); *Sherman* v. *McDermott*, 114 R. I. 107, 329 A. 2d 195 (1974); *King* v. *Allstate Insurance Co.*, 272 S. C. 259, 251 S. E. 2d 194 (1979); *Hannahs* v. *Noah*, 83 S. D. 296, 158 N. W. 2d 678 (1968); *Inland Container Corp.* v. *March*, 529 S. W. 2d 43 (Tenn. 1975); *Shortle* v. *Central Vermont Public Service Corp.*, 137 Vt. 32, 399 A. 2d 517 (1979); *Wangen* v. *Ford Motor Co.*, 97 Wis. 2d 260, 294 N. W. 2d 437 (1980).

been violated should be granted a more restrictive remedy than a person asserting an ordinary tort cause of action. Smith offers us no persuasive reason to the contrary.

Smith's argument, which he offers in several forms, is that an actual-intent standard is preferable to a recklessness standard because it is less vague. He points out that punitive damages, by their very nature, are not awarded to compensate the injured party. See *Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247, 266–267 (1981); *Electrical Workers* v. *Foust*, 442 U. S. 42, 48 (1979); *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 349–350 (1974). He concedes, of course, that deterrence of future egregious conduct is a primary purpose of both § 1983, see *Newport, supra,* at 268; *Owen* v. *City of Independence*, 445 U. S. 622, 651 (1980); *Robertson* v. *Wegmann*, 436 U. S. 584, 591 (1978), and of punitive damages, see *Newport, supra,* at 268; Restatement (Second) of Torts § 908(1) (1979). But deterrence, he contends, cannot be achieved unless the standard of conduct sought to be deterred is stated with sufficient clarity to enable potential defendants to conform to the law and to avoid the proposed sanction. Recklessness or callous indifference, he argues, is too uncertain a standard to achieve deterrence rationally and fairly. A prison guard, for example, can be expected to know whether he is acting with actual ill will or intent to injure, but not whether he is being reckless or callously indifferent.

Smith's argument, if valid, would apply to ordinary tort cases as easily as to § 1983 suits; hence, it hardly presents an argument for adopting a different rule under § 1983. In any event, the argument is unpersuasive. While, *arguendo*, an intent standard may be easier to understand and apply to particular situations than a recklessness standard, we are not persuaded that a recklessness standard is too vague to be fair or useful. In the *Milwaukee* case, 91 U. S. 489 (1876), we adopted a recklessness standard rather than a gross negligence standard precisely because recklessness would better serve the need for adequate clarity and fair application. Al-

most a century later, in the First Amendment context, we held that punitive damages cannot be assessed for defamation in the absence of proof of "knowledge of falsity or reckless disregard for the truth." *Gertz*, 418 U. S., at 349. Our concern in *Gertz* was that the threat of punitive damages, if not limited to especially egregious cases, might "inhibit the vigorous exercise of First Amendment freedoms," *ibid.*—a concern at least as pressing as any urged by Smith in this case. Yet we did not find it necessary to impose an actual-intent standard there. Just as Smith has not shown why § 1983 should give higher protection from punitive damages than ordinary tort law, he has not explained why it gives higher protection than we have demanded under the First Amendment.

More fundamentally, Smith's argument for certainty in the interest of deterrence overlooks the distinction between a standard for punitive damages and a standard of liability in the first instance. Smith seems to assume that prison guards and other state officials look mainly to the standard for punitive damages in shaping their conduct. We question the premise; we assume, and hope, that most officials are guided primarily by the underlying standards of federal substantive law—both out of devotion to duty, and in the interest of avoiding liability for compensatory damages. At any rate, the conscientious officer who desires clear guidance on how to do his job and avoid lawsuits can and should look to the standard for actionability in the first instance. The need for exceptional clarity in the standard for punitive damages arises only if one assumes that there are substantial numbers of officers who will not be deterred by compensatory damages; only such officers will seek to guide their conduct by the punitive damages standard. The presence of such officers constitutes a powerful argument *against* raising the threshold for punitive damages.

In this case, the jury was instructed to apply a high standard of constitutional right ("physical abuse of such base, inhumane and barbaric proportions as to shock the sensibilities"). It was also instructed, under the principle of

qualified immunity, that Smith could not be held liable at all unless he was guilty of "a callous indifference or a thoughtless disregard for the consequences of [his] act or failure to act," or of "a flagrant or remarkably bad failure to protect" Wade. These instructions are not challenged in this Court, nor were they challenged on grounds of vagueness in the lower courts. Smith's contention that this recklessness standard is too vague to provide clear guidance and reasonable deterrence might more properly be reserved for a challenge seeking different standards of liability in the first instance. As for punitive damages, however, in the absence of any persuasive argument to the contrary based on the policies of § 1983, we are content to adopt the policy judgment of the common law—that reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages. See *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 233 (1970) (BRENNAN, J., concurring and dissenting).

## IV

Smith contends that even if § 1983 does not ordinarily require a showing of actual malicious intent for an award of punitive damages, such a showing should be required in this case. He argues that the deterrent and punitive purposes of punitive damages are served only if the threshold for punitive damages is higher in every case than the underlying standard for liability in the first instance. In this case, while the District Judge did not use the same precise terms to explain the standards of liability for compensatory and punitive damages, the parties agree that there is no substantial difference between the showings required by the two instructions; both apply a standard of reckless or callous indifference to Wade's rights. Hence, Smith argues, the District Judge erred in not requiring a higher standard for punitive damages, namely, actual malicious intent.

This argument incorrectly assumes that, simply because the instructions specified the same *threshold* of liability for

punitive and compensatory damages, the two forms of damages were equally available to the plaintiff. The argument overlooks a key feature of punitive damages—that they are never awarded as of right, no matter how egregious the defendant's conduct. "If the plaintiff proves sufficiently serious misconduct on the defendant's part, the question whether to award punitive damages is left to the jury, which may or may not make such an award." D. Dobbs, Law of Remedies 204 (1973) (footnote omitted).[14] Compensatory damages, by contrast, are mandatory; once liability is found, the jury is required to award compensatory damages in an amount appropriate to compensate the plaintiff for his loss.[15] Hence, it is not entirely accurate to say that punitive and compensatory damages were awarded in this case on the same standard. To make its punitive award, the jury was required to find not only that Smith's conduct met the recklessness threshold (a question of ultimate fact), but *also* that his conduct merited a punitive award of $5,000 in addition to the compensatory award (a discretionary moral judgment).

---

[14] See also, *e. g.*, Restatement (Second) of Torts § 908, Comment *d* (1979); J. Ghiardi & J. Kircher, Punitive Damages Law and Practice § 5.38 (1981); C. McCormick, Law of Damages 296 (1935); W. Prosser, Law of Torts 13 (4th ed. 1971); K. Redden, Punitive Damages § 3.4(A) (1980); *Chuy* v. *Philadelphia Eagles Football Club*, 595 F. 2d 1265, 1277–1278, n. 15 (CA3 1979) (en banc).

[15] The instructions in this case recognized this difference in treatment. The jury was instructed:

"If you find the issues in favor of the plaintiff, then you *must* award the plaintiff such sum as you believe will fairly and justly compensate the plaintiff for any damages you believe he sustained as a direct result of the conduct of the defendants . . . .

"In addition to actual damages, the law *permits* the jury, under certain circumstances, to award the injured person punitive and exemplary damages . . . .

"If you find the issues in favor of the plaintiff, and if the conduct of one or more of the defendants is shown to be a reckless or callous disregard of, or indifference to, the rights or safety of others, then you *may* assess punitive or exemplary damages in addition to any award of actual damages." Tr. 642–643 (emphasis added).

Moreover, the rules of ordinary tort law are once more against Smith's argument. There has never been any general common-law rule that the threshold for punitive damages must always be higher than that for compensatory liability. On the contrary, both the First and Second Restatements of Torts have pointed out that "in torts like malicious prosecution that require a particular antisocial state of mind, the improper motive of the tortfeasor is both a necessary element in the cause of action and a reason for awarding punitive damages."[16] Accordingly, in situations where the standard for compensatory liability is as high as or higher than the usual threshold for punitive damages, most courts will permit awards of punitive damages without requiring any extra showing. Several courts have so held expressly.[17] Many other courts, not directly addressing the congruence of compensatory and punitive thresholds, have held that punitive damages are available on the same showing of fault as is required by the underlying tort in, for example, intentional infliction of emotional distress,[18] defamation of a public official

---

[16] Restatement of Torts § 908, Comment c (1939); Restatement (Second) of Torts § 908, Comment c (1979).

Although there is general agreement with the broad principle of § 908, Comment c, there is authority suggesting that the tort of malicious prosecution may have been a poorly chosen illustration of it. See, e. g., Adams v. Whitfield, 290 So. 2d 49 (Fla. 1974); Jordan v. Sauve, 219 Va. 448, 247 S. E. 2d 739 (1978).

[17] Huggins v. Deinhard, 127 Ariz., at 359–360, 621 P. 2d, at 46–47; Fletcher v. Western National Life Insurance Co., 10 Cal. App. 3d 376, 404, 89 Cal. Rptr. 78, 95 (1970); Sere v. Group Hospitalization, Inc., 443 A. 2d 33, 37–38 (D. C. 1982); Meyer v. Nottger, 241 N. W. 2d, at 922; Newton v. Standard Fire Insurance Co., 291 N. C., at 112, 229 S. E. 2d, at 301–302 (dictum); Hall v. May Department Stores Co., 292 Ore. 131, 144–145, 637 P. 2d 126, 134–135 (1981); Chuy v. Philadelphia Eagles Football Club, supra, at 1276–1278 (CA3 1979) (en banc) (Pennsylvania law); Johnson v. Woman's Hospital, 527 S. W. 2d 133, 141–142 (Tenn. App.), cert. denied (Tenn. 1975).

[18] See, e. g., Fletcher v. Western National Life Insurance Co., supra; Sere v. Group Hospitalization, Inc., supra; Cape Publications, Inc. v.

or public figure,[19] and defamation covered by a common-law qualified immunity.[20]

This common-law rule makes sense in terms of the purposes of punitive damages. Punitive damages are awarded in the jury's discretion "to punish [the defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future." Restatement (Second) of Torts § 908(1) (1979). The focus is on the character of the tortfeasor's conduct—whether it is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards. If it is of such a character, then it is appropriate to allow a jury to assess punitive damages; and that assessment does not become less appropriate simply because the plaintiff in the case faces a more demanding standard of actionability. To put it differently, society has an interest in deterring and punishing *all* intentional or reckless invasions of the rights of others, even though it some-

---

*Bridges*, 387 So. 2d 436 (Fla. App. 1980); *Meyer* v. *Nottger, supra; Hall* v. *May Department Stores Co., supra; Chuy* v. *Philadelphia Eagles Football Club, supra* (en banc) (Pennsylvania law). See also *Johnson* v. *Woman's Hospital, supra* (tort of outrageous conduct). Contra, *Knierim* v. *Izzo*, 22 Ill. 2d 73, 174 N. E. 2d 157 (1961).

[19] See, *e. g., Davis* v. *Schuchat*, 166 U. S. App. D. C. 351, 510 F. 2d 731 (1975) (District of Columbia law); *Fopay* v. *Noveroske*, 31 Ill. App. 3d 182, 334 N. E. 2d 79 (1975); *Goldwater* v. *Ginzburg*, 414 F. 2d 324 (CA2 1969) (New York law); *Sprouse* v. *Clay Communication, Inc.*, 158 W. Va. 427, 211 S. E. 2d 674 (1975) (dictum). See also *Cape Publications, Inc.* v. *Bridges, supra* (false light).

In citing the cases in this footnote and in n. 20, *infra*, we intimate no view on any First Amendment issues they may raise.

[20] *E. g., Pirre* v. *Printing Developments, Inc.*, 468 F. Supp. 1028 (SDNY) (Connecticut and New York law), affirmance order, 614 F. 2d 1290 (CA2 1979); *Weenig* v. *Wood*, 169 Ind. App. 413, 349 N. E. 2d 235 (1976); *Stuempges* v. *Parke, Davis & Co.*, 297 N. W. 2d 252 (Minn. 1980); *Snodgrass* v. *Headco Industries, Inc.*, 640 S. W. 2d 147 (Mo. App. 1982); *Miller* v. *Lear Siegler, Inc.*, 525 F. Supp. 46 (Kan. 1981) (Oklahoma law). See also n. 19, *supra*.

times chooses not to impose any liability for lesser degrees of fault.[21]

As with his first argument, Smith gives us no good reason to depart from the common-law rule in the context of § 1983. He argues that too low a standard of exposure to punitive damages in cases such as this threatens to undermine the policies of his qualified immunity as a prison guard. The same reasoning would apply with at least as much force to, for example, the First Amendment and common-law immunities involved in the defamation cases described above. In any case, Smith overstates the extent of his immunity. Smith is protected from liability for mere negligence because of the need to protect his use of discretion in his day-to-day decisions in the running of a correctional facility. See generally *Procunier* v. *Navarette*, 434 U. S. 555 (1978); *Wood* v. *Strickland*, 420 U. S. 308 (1975). But the immunity on which Smith relies is coextensive with the interest it protects.[22] The very fact that the privilege is qualified reflects a recognition that there is no societal interest in protecting those uses of a prison guard's discretion that amount to reckless or callous indifference to the rights and safety of the prisoners in his charge. Once the protected sphere of privilege is exceeded, we see no reason why state officers should not be liable for their reckless misconduct on the same basis as private tortfeasors.[23]

---

[21] "Moreover, after *Carey* punitive damages may be the only significant remedy available in some § 1983 actions where constitutional rights are maliciously violated but the victim cannot prove compensable injury." *Carlson*, 446 U. S., at 22, n. 9.

[22] As we noted *supra*, at 33–34, Smith does not challenge the instruction on qualified immunity. We therefore assume for purposes of this case that the instruction was correct. See generally, *e. g.*, *Procunier* v. *Navarette*, 434 U. S. 555 (1978).

[23] We reject JUSTICE REHNQUIST's argument, *post*, at 92, that it somehow makes a difference that this suit was brought in federal court—as though it were inappropriate or unseemly that federal courts dare to enforce federal rights vigorously. Indeed, one wonders whether JUSTICE

## V

We hold that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. We further hold that this threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness. Because the jury instructions in this case are in accord with this rule, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and JUSTICE POWELL join, dissenting.

This case requires us to determine what degree of culpability on the part of a defendant in an action under 42 U. S. C. § 1983 (1976 ed., Supp. V) will permit an award of punitive damages. The District Court instructed the jury that it could award punitive damages in favor of the plaintiff if it concluded that the defendant's conduct constituted "reckless or callous disregard of, or indifference to, the rights or safety of others." In my view, a forthright inquiry into the intent of the 42d Congress and a balanced consideration of the public policies at issue compel the conclusion that the proper standard for an award of punitive damages under § 1983 requires at least some degree of bad faith or improper motive on the part of the defendant.

---

REHNQUIST would complain as loudly if this § 1983 suit had been brought in state court, as it could have been. Although JUSTICE REHNQUIST casts his argument as an attack on meddling by federal *courts,* the true thrust of his complaint seems to be against federal *law*—i. e., the Civil Rights Act of 1871. We have explained at length why we think that the policies of that statute call for our holding today.

The Court rejects a "wrongful intent" standard, instead requiring a plaintiff to show merely "reckless . . . indifference to the federally protected rights of others." The following justifications are offered by the Court for this result: first, the rule in "[m]ost cases [decided in the last 15 years] under state common law" is "more or less" equivalent to a recklessness standard; second, the Court asserts that a similar rule "prevail[ed] at the time when § 1983 was enacted"; and finally, there is an "absence of any persuasive argument" for not applying existing state tort rules to the federal statutory remedies available against state and local officials under § 1983. In my opinion none of these justifications, taken singly or together, supports the Court's result. First, the decisions of state courts in the last decade or so are all but irrelevant in determining the intent of the 42d Congress, and thus, the meaning of § 1983. Second, the Court's characterization of the common-law rules prevailing when § 1983 was enacted is both oversimplified and misleading; in fact, the majority rule in 1871 seems to have been that some sort of "evil intent"—and not mere recklessness—was necessary to justify an award of punitive damages. Third, the Court's inability to distinguish a *state* court's award of punitive damages against a state officer from a *federal* court's analogous action under §§ 1983 and 1988 precludes it from adequately assessing the public policies implicated by its decision. Finally, the Court fails utterly to grapple with the cogent and persuasive criticisms that have been offered of punitive damages generally.

## I

Before examining these points, however, it is useful to consider briefly the purposes of punitive damages. A fundamental premise of our legal system is the notion that damages are awarded to *compensate* the victim—to redress the injuries that he or she *actually* has suffered. D. Dobbs, Law of Remedies § 3.1 (1973); C. McCormick, Law of Dam-

ages 1 (1935). In sharp contrast to this principle, the doctrine of punitive damages permits the award of "damages" beyond even the most generous and expansive conception of actual injury to the plaintiff. This anomaly is rationalized principally on three grounds. First, punitive damages "are assessed for the avowed purpose of visiting *a punishment* upon the defendant." *Id.*, at 275 (emphasis added); Dobbs, *supra*, § 3.9, at 205; K. Redden, Punitive Damages § 2.1 (1980); *Electrical Workers* v. *Foust*, 442 U. S. 42, 48 (1979). Second, the doctrine is rationalized on the ground that it deters persons from violating the rights of others. *Ibid.* Third, punitive damages are justified as a "bounty" that encourages private lawsuits seeking to assert legal rights. *Ibid.*

Despite these attempted justifications, the doctrine of punitive damages has been vigorously criticized throughout the Nation's history. Countless cases remark that such damages have never been "a favorite of the law."[1] The year after § 1983 was enacted, the New Hampshire Supreme Court declared: "The idea of [punitive damages] is wrong. It is a monstrous heresy. It is an unsightly and unhealthy excrescence, deforming the symmetry of the body of the law." *Fay* v. *Parker*, 53 N. H. 342, 382 (1872).[2] Such remarks reflect a number of deeply held reservations regarding punitive damages, which can only be briefly summarized here.

---

[1] See, *e. g.*, *Williams* v. *Bone*, 74 Idaho 185, 189, 259 P. 2d 810, 812 (1953); *Jolley* v. *Puregro Co.*, 94 Idaho 702, 709, 496 P. 2d 939, 946 (1972); *Cays* v. *McDaniel*, 204 Ore. 449, 283 P. 2d 658 (1955); *First National Bank of Des Plaines* v. *Amco Engineering Co.*, 32 Ill App. 3d 451, 455, 335 N. E. 2d 591, 594 (1975). See also the numerous cases cited at 25 C. J. S., Damages § 117(1), p. 1114, n. 18.5 (1966).

[2] See also *Spokane Truck & Dray Co.* v. *Hoefer*, 2 Wash. 45, 56, 25 P. 1072, 1075 (1891) ("we believe that the doctrine of punitive damages is unsound in principle, and unfair and dangerous in practice . . ."); *Roose* v. *Perkins*, 9 Neb. 304, 315 (1879).

Punitive damages are generally seen as a windfall to plaintiffs, who are entitled to receive full compensation for their injuries—but no more. Even assuming that a punitive "fine" should be imposed after a civil trial, the penalty should go to the State, not to the plaintiff—who by hypothesis is fully compensated. Moreover, although punitive damages are "quasi-criminal," *Huber* v. *Teuber,* 10 D. C. 484, 490 (1877), their imposition is unaccompanied by the types of safeguards present in criminal proceedings. This absence of safeguards is exacerbated by the fact that punitive damages are frequently based upon the caprice and prejudice of jurors. Walther & Plein, Punitive Damages: A Critical Analysis, 49 Marq. L. Rev. 369 (1965). We observed in *Electrical Workers* v. *Foust, supra,* at 50–51, n. 14, that "punitive damages may be employed to punish unpopular defendants," and noted elsewhere that "juries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the actual harm caused." *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 350 (1974). Finally, the alleged deterrence achieved by punitive damages awards is likely outweighed by the costs—such as the encouragement of unnecessary litigation and the chilling of desirable conduct—flowing from the rule, at least when the standards on which the awards are based are ill-defined. Long, Punitive Damages: An Unsettled Doctrine, 25 Drake L. Rev. 870 (1976).

Because of these considerations, a significant number of American jurisdictions refuse to condone punitive damages awards. See, *e. g., Killibrew* v. *Abbott Laboratories,* 359 So. 2d 1275 (La. 1978); *Burt* v. *Advertiser Newspaper Co.,* 154 Mass. 238, 28 N. E. 1 (1891) (Holmes, J.); *Miller* v. *Kingsley,* 194 Neb. 123, 124, 230 N. W. 2d 472, 474 (1975); *Vratsenes* v. *New Hampshire Auto, Inc.,* 112 N. H. 71, 73, 289 A. 2d 66, 68 (1972); *Pereira* v. *International Basic Economy Corp.,* 95 P. R. R. 28 (1967); *Maki* v. *Aluminum Building Products,* 73 Wash. 2d 23, 25, 436 P. 2d 186, 187

(1968). See also *Murphy* v. *Hobbs*, 7 Colo. 541, 5 P. 119 (1884) (no punitive damages at common law). Other jurisdictions limit the amount of punitive damages that may be awarded, for example, to the plaintiff's attorney's fees, see *Triangle Sheet Metal Works, Inc.* v. *Silver*, 154 Conn. 116, 222 A. 2d 220 (1966), or otherwise, *Riggs* v. *Fremont Insurance Co.*, 85 Mich. App. 203, 270 N. W. 2d 654 (1978).

Nonetheless, a number of States do permit juries to award punitive damages in certain circumstances. Historically, however, there has been little uniformity among the standards applied in these States for determining on what basis a jury might award punitive damages. See, *e. g.*, Owen, Punitive Damages in Products Liability Litigation, 74 Mich. L. Rev. 1257, 1283, and n. 135 (1976); Ellis, Fairness and Efficiency in the Law of Punitive Damages, 56 S. Cal. L. Rev. 1, 52–53 (1982) ("the law of punitive damages is characterized by a high degree of uncertainty that stems from the use of a multiplicity of vague, overlapping terms"); *Duckett* v. *Pool*, 34 S. C. 311, 325, 13 S. E. 542, 547 (1891); *Lynd* v. *Picket*, 7 Minn. 184, 200 (1862).

One fundamental distinction is essential to an understanding of the differences among the various standards for punitive damages. Many jurisdictions have required some sort of wrongful motive, actual intention to inflict harm or intentional doing of an act known to be unlawful—"express malice," "actual malice," "bad faith," "wilful wrong" or "ill will." [3]

---

[3] See the cases cited in n. 12, *infra*. Decisions handed down at the time the 42d Congress deliberated leave little question that when a court required a showing of malice in order to recover punitive damages, an inquiry into the actual mental state of the defendant—his motives, intentions, knowledge, or design—was required. The Court reasons that, when used in connection with punitive damages, "malice" really meant something akin to recklessness. The cases simply do not support the claim. The term "malice" often was prefaced with the qualifiers "actual" or "express." See, *e. g.*, *Barlow* v. *Lowder*, 35 Ark. 492, 496 (1880); *Barnett* v. *Reed*, 51 Pa. 190, 191 (1865); *Boardman* v. *Goldsmith*, 48 Vt.

Other States, however, have permitted punitive damages awards merely upon a showing of very careless or negligent conduct by the defendant—"gross negligence," "reck-

---

403, 407, 411 (1875); *Ogg* v. *Murdock,* 25 W. Va. 139, 146–147 (1884). When it was not, the context in which it was used virtually always makes it completely clear that an inquiry into the actual intentions and motives of the defendant was required before punitive damages could be awarded. See, *e. g., Brewer* v. *Watson,* 65 Ala. 88, 96–97 (1880); *Kelly* v. *McDonald,* 39 Ark. 387, 393 (1882); *Davis* v. *Hearst,* 160 Cal. 143, 163–164, 116 P. 530, 539–540 (1911) ("malice of evil motive"); *Huber* v. *Teuber,* 10 D. C. 484, 489–491 (1871); *Jeffersonville R. Co.* v. *Rogers,* 38 Ind. 116, 124–125 (1871); *Curl* v. *Chicago, R. I. & P. R. Co.,* 63 Iowa 417, 428–429, 19 N. W. 308 (1884); *Lynd* v. *Picket,* 7 Minn. 184 (1862); *Carli* v. *Union Depot, Street R. & T. Co.,* 32 Minn. 101, 104, 20 N. W. 89, 90 (1884); *Winter* v. *Peterson,* 24 N. J. L. 524, 529 (1854); *Haines* v. *Schultz,* 50 N. J. L. 481, 484–485, 14 A. 488, 489 (1888); *Causee* v. *Anders,* 20 N. C. 246, 248 (1839); *Windham* v. *Rhame,* 11 S. C. L. 283 (1858). And, even standing alone, the term generally was understood to require inquiry into the defendant's mental state: "In malicious injuries, the injurer foresees the specific evil result and wills it either explicitly or implicitly; in negligent injuries he may foresee a probable danger and may rashly risk the consequences, without being chargeable with a malicious intent." F. Wharton, Law of Negligence § 15 (1874).

Of course, there was a "technical," 19 American and English Encyclopedia of Law 623 (2 ed. 1901), definition of the term that had little to do with actual ill will, but which permitted such a mental state to be presumed from the mere occurrence of an injury. This virtually never was the basis for an award of punitive damages: if it had been, such damages would have been available in every tort action, which never was the rule in any jurisdiction. The Court does not seriously argue otherwise.

Moreover, malice was often the standard employed in jury instructions. *E. g., Hays* v. *Anderson,* 57 Ala. 374 (1876); *Coleman & Newsome* v. *Ryan,* 58 Ga. 132, 134 (1877); *Jeffersonville R. Co.* v. *Rogers, supra; Lynd* v. *Picket, supra; Morely* v. *Dunbar,* 24 Wis. 183 (1869). There is not the slightest question that a jury of lay persons would have understood the phrase as requiring actual ill will, desire to injure, or other improper motive on the part of the defendant. "Malice" was defined by a dictionary published at the approximate time § 1983 was enacted as "extreme enmity of heart; a disposition to injure others unjustly for personal gratification or from a spirit of revenge; spite; deliberate mischief." Stormonth's English Dictionary 584 (1885). See also Webster's Dictionary 804 (1869); Worcester's Dictionary 873 (1860); 2 Abbott's Law Dictionary 72 (1879) ("a malig-

lessness," or "extreme carelessness."[4]   In sharp contrast to the first set of terms noted above, which connote a requirement of actual ill will towards the plaintiff, these latter phrases import only a degree of negligence.   This distinction between

nant design of evil . . . is the idea attached to the word in popular use"). In short, the available authorities demonstrate that for purposes of punitive damages at the time of the 42d Congress, "malice" imported an actual ill will, intent, or improper motive requirement.

In a few cases decided roughly contemporaneously with the enactment of § 1983, the terms "wanton" and "willful" were used, together with other phrases, to define the proper standard for an award of punitive damages. The Court finds little "ambiguity or confusion" surrounding these· terms, and concludes that they clearly indicate a "recklessness" standard.   The cases and commentators disagree.   As one treatise flatly states: "[T]he term 'wanton' has no peculiar legal signification.   It has various meanings, depending on the connection in which it is used."   40 Cyclopedia of Law and Procedure 292–293 (1912).   The "connection in which ['wanton'] is used," *ibid.*, in punitive damages cases virtually always reveals that the word was merely an alternative phrasing of the evil motive requirement. See, *e. g.*, *Pike* v. *Dilling*, 48 Me. 539 (1861); *Wilkinson* v. *Drew*, 75 Me. 360, 363 (1883); *Devine* v. *Rand*, 38 Vt. 621 (1866); *Boutwell* v. *Marr*, 71 Vt. 1, 11, 42 A. 607, 610 (1899).   In the few cases where context does not make clear what was meant by "wanton," several considerations suggest that it was likely that an inquiry into the motives and intentions of the defendant was intended.   As a general proposition, when used in criminal contexts, wanton meant that "the act done is of a wilful, wicked purpose." 30 American and English Encyclopedia of Law 3 (2d ed. 1905).   In deciding whether to impose the "quasi-criminal" punishment of punitive damages, this meaning likely would have been that intended by courts using the phrase.

Moreover, as used in a jury instruction—as occasionally was the case, see, *e. g.*, *Jeffersonville R. Co.* v. *Rogers*, *supra*, at 124–125; *Pike* v. *Dilling*, *supra*—the term would have been understood by laymen to require some sort of evil or dissolute intention.   See Stormonth's English Dictionary 1146 (1885); Webster's Dictionary 1490 (1869); Worcester's Dictionary 1645 (1860).   "Wantonly" most frequently was defined as "lewdly" which in turn was regarded as synonymous with "wickedly."   Webster's Dictionary 768 (1869); Worcester's Dictionary 834 (1860).   The Court's claim that decisions predicating punitive damages on wantonness reflected a recklessness standard is unfounded.   The word had no fixed meaning,

*[Footnote 4 is on p. 64]*

acts that are intentionally harmful and those that are very negligent, or unreasonable, involves a basic difference of kind, not just a variation of degree. W. Prosser, Law of Torts § 34, p. 185 (4th ed. 1971); Restatement (Second) of

and decisions using it must be examined individually; to the extent the phrase did have a common meaning, it was, particularly in the context of punitive sanctions, one implying some sort of bad intent.

Likewise, the Court's conclusion regarding the meaning of decisions using the phrase "willful" is unduly simplified. Like "wanton," the phrase had no fixed meaning, 29 American and English Encyclopedia of Law 114–117 (1895); for the meaning intended in a particular context, reference must be had to the decisions at issue, see n. 12, *infra*. If one must generalize, criminal law again is useful, given the "quasi-criminal" character of punitive damages: "the word, as ordinarily used, means not merely voluntarily, but with bad purpose," 29 American and English Encyclopedia of Law 114 (1895). Even more important, however, is the fact that "willful" seldom, if ever, was an independent standard; rather, "willful injury" or "willfully illegal conduct" were the typical contexts in which the phrase appeared. As to these, even apart from the surrounding language of the punitive damages decisions, it was clear that "[t]o constitute wilful injury there must be design, purpose, intent to do wrong and inflict the injury." 30 American and English Encyclopedia of Law 536 (2d ed. 1905). And, of course, a "willful trespass" or other misdeed meant an intentionally wrongful act. *Id.*, at 525–529. Thus, in jurisdictions using the term "willfully," the question generally was whether the defendant knowingly and intentionally harmed the plaintiff, or, alternatively, intentionally committed an act he knew to be tortious or unlawful. In both these cases, inquiry into the wrongful motive of the defendant plainly was demanded; of course, recklessness does not satisfy this requirement.

The Court's discussion of the term "willful negligence" is of little relevance to the common-law standard for punitive damages. The phrase seldom was used, particularly in the punitive damages context, and when it was, it justifiably encountered vigorous criticism. As one court remarked, the phrase "willful neglect" made as much sense as "guilty innocence." *Kelly* v. *Malott*, 135 F. 74 (CA7 1905). Faced with what appeared to be a self-contradictory term, the likely reaction of juries, courts, and Members of the 42d Congress would have been to focus on the unequivocal intent and malice requirements common at the time. In short, whatever general statements may have been made in some treatises regarding "wanton" and "willful," in determining the meaning of the terms in this context, a more careful inquiry is demanded. As the foregoing discussion and the cases discussed *infra* demonstrate, that inquiry makes it clear that the Court's

Torts § 500, Comment *f* (1965). The former typically demands inquiry into the actor's subjective motive and purpose, while the latter ordinarily requires only an objective determination of the relative risks and advantages accruing to society from particular behavior. See *id.*, § 282.

The importance of this distinction is reflected in what one court, speaking not many years before the time § 1983 was enacted, said:

> "[I]n morals, and the eye of the law, there is a vast difference between the criminality of a person acting mistakenly from a worthy motive, and one committing the same act from a wanton and malignant spirit, and with a corrupt and wicked design." *Simpson* v. *McCaffrey*, 13 Ohio 508, 522 (1844).

The Ohio court, applying this distinction, held that punitive damages could only be awarded where some "evil motive"

---

recklessness standard was seldom used at the time of the enactment of § 1983.

[4] "Recklessness" generally was defined as "heedlessness" or "negligence," while synonyms included "careless." Stormonth's English Dictionary 832 (1885). In strict legal terms, recklessness is conduct somewhat more dangerous—and therefore unreasonable—than merely negligent conduct, see Restatement (Second) of Torts § 500 (1965); despite this distinction, it is plain that recklessness is different from intentionally harmful conduct not just in this type of degree, but in kind, *ibid.*, Comment *f*.

Undoubtedly, the recklessness or objective unreasonableness of particular conduct will be evidence of the intent of the actor, see n. 8, *infra*. This point has been recognized by commentators on the subject. In 1 J. Sutherland, Law of Damages (1882), for example, the author states the general rule that "[t]here is . . . a marked difference legally, as there is practically, between a tort committed with and without malice; between a wrong done in the assertion of a supposed right, and one wantonly committed . . . ." *Id.*, at 716. The author, however, also observed that "such recklessness or negligence *as evinces* malice or conscious disregard of the rights of others," will support a punitive damages award. *Id.*, at 724 (emphasis added). It is a far different thing to say, as Sutherland does, that the defendant's recklessness is relevant to ascertaining ill will than it is to say, as the Court does, that this lack of care *itself* justifies punitive damages.

was involved. *Ibid.* Oliver Wendell Holmes identified precisely the same distinction between intentionally injurious conduct and careless conduct:

> "Vengeance imports a feeling of blame, and an opinion, however distorted by passion, that a wrong has been done. [E]ven a dog distinguishes between being stumbled over and being kicked." O. Holmes, The Common Law 3 (1881).[5]

It is illuminating to examine the Court's reasoning with this distinction in mind.

## II

At bottom, this case requires the Court to decide when a particular remedy is available under § 1983. Until today, *ante*, at 34–35, n. 2, the Court has adhered, with some fidelity, to the scarcely controversial principle that its proper role in interpreting § 1983 is determining what the 42d Congress intended. That § 1983 is to be interpreted according to this basic principle of statutory construction, 2A C. Sands, Sutherland on Statutory Construction § 45.05 (4th ed. 1972), is clearly demonstrated by our many decisions relying upon the plain language of the section. See, *e. g., Parratt* v. *Taylor*, 451 U. S. 527, 534 (1981); *Maine* v. *Thiboutot*, 448 U. S. 1, 4 (1980); *Owen* v. *City of Independence*, 445 U. S. 622, 635 (1980). The Court's opinion purports to pursue an inquiry

---

[5] The same point was made in *Wise* v. *Daniel*, 221 Mich. 229, 233, 190 N. W. 746, 747 (1922), where the court wrote:

"If a cow kicks a man in the face, the consequent physical hurt may equal that from a kick in the face with a hob-nailed boot, but the 'cussedness' of the cow raises no sense of outrage, while the malicious motive back of the boot kick adds materially to the victim's sense of outrage. If a man employs spite and venom in administering a physical hurt, he must not expect his maliciousness to escape consideration when he is cast to make compensation for his wrong."

See also *Inman* v. *Ball*, 65 Iowa 543, 546, 22 N. W. 666, 668 (1885) ("To warrant a jury in inflicting damages by way of punishment, it should appear that the act complained of was a willful or malicious wrong. . . . This is a very different state of mind and purpose from that of a person who has no more than good reason to believe his act is wrongful").

into legislative intent, yet relies heavily upon state-court decisions decided well after the 42d Congress adjourned, see *ante*, at 48, n. 13. I find these cases unilluminating, at least in part because I am unprepared to attribute to the 42d Congress the truly extraordinary foresight that the Court seems to think it had. The reason our earlier decisions interpreting § 1983 have relied upon common-law decisions is simple: Members of the 42d Congress were lawyers, familiar with the law of their time. In resolving ambiguities in the enactments of that Congress, as with other Congresses, it is useful to consider the legal principles and rules that shaped the thinking of its Members. The decisions of state courts decided well after 1871, while of some academic interest, are largely irrelevant to what Members of the 42d Congress intended by way of a standard for punitive damages.

In an apparent attempt to justify its novel approach to discerning the intent of a body that deliberated more than a century ago, the Court makes passing reference to our decisions relating to common-law immunities under § 1983. These decisions provide no support for the Court's analysis, since they all plainly evidence an attempt to discern the intent of the 42d Congress, albeit indirectly, by reference to the common-law principles known to Members of that body. In *Tenney* v. *Brandhove*, 341 U. S. 367 (1951), one of our earliest immunity decisions, we phrased the question whether legislators were immune from actions under § 1983 as follows:

> "Did Congress by the general language of its 1871 statute mean to overturn the tradition of legislative freedom achieved in England by Civil War and carefully preserved in the formation of State and National Governments here? Did it mean to subject legislators to civil liability for acts done within the sphere of legislative activity?" *Id.*, at 376.

More recently, in *Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247, 258 (1981), we said:

"It is by now well settled that the tort liability created by § 1983 cannot be understood in a historical vacuum. . . . One important assumption underlying the Court's decisions in this area is that members of the 42d Congress were familiar with common-law principles, including defenses previously recognized in ordinary tort litigation, and that they likely intended these common-law principles to obtain, absent specific provisions to the contrary."

Likewise, our other decisions with respect to common-law immunities under § 1983 clearly reveal that our consideration of state common-law rules is only a device to facilitate determination of congressional intent.[6] Decisions from the

---

[6] See also *Briscoe* v. *LaHue*, 460 U. S. 325, 337, 345 (1983) ("[N]o evidence that Congress intended to abrogate the traditional common-law witness immunity in § 1983 actions," and "[i]n 1871, common-law immunity for witnesses was well settled"); *Imbler* v. *Pachtman*, 424 U. S. 409, 417–418 (1976) (*"Tenney* squarely presented the issue of whether the Reconstruction Congress had intended to restrict the availability in § 1983 suits of those immunities which historically, and for reasons of public policy, had been accorded to various categories of officials"); *Procunier* v. *Navarette*, 434 U. S. 555, 561 (1978) ("Although the Court has recognized that in enacting § 1983 Congress must have intended to expose state officials to damages liability in some circumstances, the section has been consistently construed as not intending wholesale revocation of the common-law immunity afforded government officials"); *Carey* v. *Piphus*, 435 U. S. 247, 255 (1978) ("The Members of the Congress that enacted § 1983 did not address directly the question of damages, but the principle that damages are designed to compensate persons for injuries caused by the deprivation of rights hardly could have been foreign to many lawyers in Congress in 1871"); *Wood* v. *Strickland*, 420 U. S. 308, 316–318 (1975) (relying upon common-law tradition).

Our decision in *Pierson* v. *Ray*, 386 U. S. 547, 553–554 (1967), was based squarely on an attempt to determine what the 42d Congress intended in enacting § 1983. Chief Justice Warren wrote: "Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction, as this Court recognized when it adopted the doctrine, in *Bradley* v. *Fisher*, 13 Wall. 335 (1872)." Similarly, our decision in *Imbler* v. *Pachtman, supra,*

1970's, relied on by the Court, are almost completely irrelevant to this inquiry into legislative intent.

## III

The Court also purports to rely on decisions, handed down in the second half of the last century by this Court, in drawing up its rule that mere recklessness will support an award of punitive damages. In fact, these decisions unambiguously support an actual-malice standard. The Court rests primarily on *Philadelphia, W. & B. R. Co.* v. *Quigley,* 21 How. 202 (1859), a diversity tort action against a railroad. There, we initially observed that in "certain actions of tort," punitive damages might be awarded, and then described those actions as "[w]henever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity." *Id.,* at 214. As discussed previously, n. 3, *supra,* it was relatively clear at the time that "malice" required a showing of actual ill will or intent to injure. Perhaps foreseeing future efforts to expand the rule, however, we hastened to specify the type of malice that would warrant punitive damages: "the malice spoken of in this rule is not merely the doing of an unlawful or injurious act. The word implies that the act complained of *was conceived in the spirit of mischief, or of criminal indifference to civil obligations.*" 21 How., at 214 (emphasis added). It would have been difficult to have more clearly expressed the "actual malice" standard. We explicitly rejected an "implied malice" formulation, and then mandated inquiry into the "spirit" in which a defendant's act was "conceived."

The Court does not address the requirement, explicitly set forth in *Quigley,* that punitive damages depend on the spirit in which an act was conceived. Instead, focusing only on the words "criminal indifference," *ante,* at 41–42, n. 9, the Court

at 421, was "predicated upon a considered inquiry into the immunity *historically accorded the relevant official at common law* and the interests behind it" (emphasis added).

suggests that the use of this phrase indicates that *Quigley* established no requirement of wrongful intent. This is unlikely. An authority on criminal law in the 1870's wrote:

> "In no one thing does criminal jurisprudence differ more from civil more than in its different doctrine concerning the intent. The law, seeking justice between man and man, frequently holds one to the civil consequences of his act, though he neither intended the act, nor suffered himself to be influenced by an evil mind, producing it unintended . . . . But the different nature of the criminal law admits of no such distinction; for crime proceeds only from a criminal mind . . . .

> ". . . There is only one criterion by which the guilt of men is to be tested. It is whether the mind is criminal. . . . It is therefore a principle of our legal system, as probably it is of every other, that the essence of an offense is the wrongful intent, without which it cannot exist." 1 J. Bishop, Criminal Law §§ 286–287 (5th ed. 1872).

Of course, as the Court notes, there are crimes based on reckless or negligent conduct; it reasons from this that the "criminality" requirement in *Quigley* is not confined to cases where persons act with wrongful intent. Yet the requirement of "criminal" spirit is far more sensibly interpreted, not as incorporating every possible twist and turn of criminal law, but as reflecting "a principle of our legal system . . . that the essence of an offence is the wrongful intent." 1 Bishop, *supra*, § 287. Indeed, the Court's argument proves far too much: if we are to assume that the reference to "criminal indifference" in *Quigley* was meant, as the Court argues, to incorporate every possible mental state that justifies the imposition of criminal sanctions, then punitive damages would be available for simple negligence. Plainly our decision in *Quigley* does not stand for this remarkable proposition.

Even assuming some ambiguity in our decision in *Quigley*, however, the careful discussion of punitive damages in *Day* v. *Woodworth*, 13 How. 363, 371 (1852), dispels any doubts. While the Court dismisses this treatment as "merely . . . a sidelight," *ante*, at 42, n. 9, in *Quigley* we evidently thought otherwise: in addition to citing and relying explicitly on *Day*, see 21 How., at 213–214, we also drew our punitive damages standard from that case. *Ibid.* *Day* made it perfectly clear that punitive damages cannot be awarded absent actual evil motive. It reasoned that punitive damages are predicated on the "malice, wantonness, oppression, or outrage of the defendant's conduct," and stated the following standard:

> "In actions of trespass, where the injury has been wanton and malicious, or gross and outrageous, courts permit juries to add to the measured compensation of the plaintiff which he would have been entitled to recover, *had the injury been inflicted without design or intention*, something further by way of punishment or example." 13 How., at 371 (emphasis added).

Elsewhere in *Day* we explained that punitive damages are awarded because of "moral turpitude or atrocity." *Ibid.* It is obvious from these references that we understood the terms "malice" and "wantonness" as requiring that a defendant have acted with evil purposes or intent to do injury. It was with this understanding of the phrases in question that the *Quigley* Court framed its rule, and with this background, any fair reading of that decision could not avoid the conclusion that the Court intended to create an actual-malice requirement.

Our decisions following 1871 indicate yet more clearly that we adhered to an actual-malice or intent-to-injure requirement in punitive damages actions. In *Milwaukee & St. Paul R. Co.* v. *Arms*, 91 U. S. 489 (1876), a verdict against a railroad in a diversity action was reversed because the jury was erroneously charged that it might award punitive damages on

a finding of "gross negligence." The *Arms* Court first expressed reservations regarding the entire doctrine of punitive damages, remarking that since "the question of intention is always material in an action of tort" in fixing compensatory damages, permitting punitive damages based on the same element posed the threat of double recovery. Nonetheless, acknowledging that the remedy had been approved in *Day* and *Quigley*, the Court concluded that the rule set forth in those decisions should be followed. After quoting the passage in *Quigley*, discussed above, rejecting an implied-malice and adopting an actual-intent-to-injure standard, the Court said:

> "[The rule permitting punitive damages is] applicable to suits for personal injuries received through the negligence of others. Redress commensurate to such injuries should be afforded. In ascertaining its extent, the jury may consider all the facts which relate to the wrongful act of the defendant, and its consequences to the plaintiff; but they are not at liberty to go farther, unless *it was done wilfully, or was the result of that reckless indifference to the rights of others which is equivalent to an intentional violation of them*. . . . The tort is aggravated by *the evil motive, and on this rests the rule of exemplary damages*." 91 U. S., at 493 (emphasis added).

Read in context, this language strongly suggests that an actual-malice standard was intended. The rule of exemplary damages "rests" on a defendant's "evil motive," and, while "reckless indifference" may justify some awards of punitive damages, it may do so only in "that" class of "reckless indifference . . . which is equivalent to an *intentional violation*" of the plaintiff's rights. *Ibid.* (emphasis added).

This interpretation of the opinion in *Arms* is the only reading that can be squared with the holding of that case.[7] The

---

[7] Elsewhere in the *Arms* opinion, the Court stated that an award of punitive damages is available only where there was "some wilful misconduct,

Court held that it was error to give an instruction that "gross negligence" would support a finding of punitive damages. This instruction was condemned because "gross negligence" is "a relative term," and "a word of description, and not of definition." *Id.*, at 495. The Court regarded "gross negligence" as too imprecise and ill-defined a standard to support the extraordinary remedy of punitive damages. Given this, it is more than a little peculiar to read the *Arms* opinion as supporting the recklessness standard embraced by the Court.

A leading authority on the law of torts has written that there "is often no clear distinction at all between ['recklessness'] and 'gross' negligence, and the two have tended to merge and take on the same meaning, of an aggravated form of negligence . . . ." W. Prosser, Law of Torts § 34, p. 185 (4th ed. 1971); see also n. 3, *supra*. Given the virtual identity of the two standards, a Court that held that "gross negligence" was too imprecise a standard to warrant a punitive damages award would not likely have intended its dicta to be read as adopting "recklessness" as an alternative standard. In contrast, a standard of culpability demanding inquiry into the wrongful mental state of the defendant—"evil motive,"

or that entire want of care which would raise the presumption of a *conscious* indifference to consequences." 91 U. S., at 495 (emphasis added). The Court notes the problems in transforming "indifference . . . into intent," *ante*, at 43–44, n. 10, without confronting the equally difficult task of transforming "conscious[ness]" into inadvertence. Plainly, the question whether a defendant was "conscious" of a certain fact demands inquiry into his subjective mental state, not merely an objective determination of the reasonableness of his conduct. As others have observed: "When willfullness enters, negligence steps out. The former is characterized by advertence, and the latter by inadvertence." *Christy* v. *Butcher*, 153 Mo. App. 397, 401, 134 S. W. 1058, 1059 (1911). Yet, on reflection, the *Arms* formulation need not be regarded as self-contradictory: reckless and negligent conduct may be considered, and are highly probative, in determining whether to award punitive damages. They serve, however, as evidence of "willful misconduct," "evil motive," or a *conscious* choice to impose known injury on another, not as the standard for liability itself.

"conceived in the spirit of mischief, or of criminal indifference," or "design or intention" to do injury—is different in kind, not just degree, from the "very careless" standard explicitly rejected by the *Arms* Court. This standard is a significant step away from the "relative" and ill-defined terms of "description" that the Court thought so unsatisfactory; it seems obvious that the *Arms* Court meant to take just such a step.

Moreover, the meaning of the *Arms* decision was made abundantly clear in a case decided the same day *Arms* was handed down. In *Western Union Telegraph Co.* v. *Eyser*, 91 U. S. 495 (1876), the Court reversed a decision of the Supreme Court of the Territory of Colorado holding that on "no view of the evidence was the court below justified in instructing the jury that exemplary damages could be recovered." The Reporter of Decisions explained: "The [defendant's] omission to . . . give some other proper warning . . . was an act of negligence, entitling the plaintiff to compensatory damages. But there was nothing to authorize the jury to consider the omission as *wilful:* on the contrary, the evidence rebuts every presumption that there was *any intentional wrong.*" *Id.*, at 496 (emphasis added).[8] The defendant in the case, who left electrical wires strung several feet above the ground across a city street in Denver without any real warning, may well have been reckless; certainly, as in fact occurred, a jury could have reached this conclusion. But this was irrelevant: in order to recover punitive damages an "intentional wrong" is what was needed.

---

[8] This Court's understanding of the term "willfully" was clearly stated in *Felton* v. *United States*, 96 U. S. 699, 702 (1878), where, in an action to recover a $1,000 penalty from a distiller, the Court said: "Doing or omitting to do a thing knowingly and wilfully, implies not only a knowledge of the thing, but a determination with a bad intent . . . ." Likewise, it quoted with approval from a Massachusetts decision stating that "wilfully" ordinarily means "not merely 'voluntarily,' but with a bad purpose." *Ibid.* See also n. 3, *supra.*

Perhaps, by minute dissection of stray clauses in a few of the foregoing decisions, combined with a studied refusal to confront the plain intent underlying phrases like "evil motive," "design and intention," and "intentional wrong," one could discern some shadowy rule of liability resting on recklessness. *Ante,* at 39–48. Ninety years ago, however, the Court, after an exhaustive analysis of the foregoing decisions, explicitly and unambiguously reached precisely the opposite conclusion. In *Lake Shore & M. S. R. Co.* v. *Prentice,* 147 U. S. 101 (1893), the Court considered whether punitive damages were properly awarded against a railroad in a diversity action. The Court noted that the law on the subject was "well-settled," *id.,* at 107, and paraphrased the *Quigley* standard: The jury may award punitive damages "if the defendant has acted wantonly, or oppressively, or with such malice as implies a spirit of mischief or criminal indifference to civil obligations." 147 U. S., at 107. Then, as it had in *Day* and *Arms,* the Court explained this formulation, observing that a *"guilty intention* on the part of the defendant is *required* in order to charge him with exemplary or punitive damages." 147 U. S., at 107 (emphases added). In addition, the Court quoted, with plain approval, the following statements of the New Jersey Supreme Court in *Haines* v. *Schultz,* 50 N. J. L. 481, 484, 14 A. 488, 489 (1888): "The right to award [punitive damages] rests primarily upon the single ground—wrongful motive. . . . It is the wrongful personal intention to injure that calls forth the penalty. To this wrongful intent knowledge is an essential prerequisite." 147 U. S., at 110. The Court went on to note that "criminal intent [is] necessary to warrant the imposition of [punitive] damages," *id.,* at 111, and elsewhere wrote that "wanton, malicious or oppressive intent" and "unlawful and criminal intent," were required for the award of such damages. *Ibid.; id.,* at 114. *Prentice* simply leaves no question that actual wrongful intent, not just recklessness, was required for a

recovery of punitive damages, and, in addition, that this was what "well-settled" law always had required.[9]

And, once again, in *Scott* v. *Donald,* 165 U. S. 58, 86 (1897), we made it completely clear that actual malice was a prerequisite to a recovery of punitive damages. In *Scott,* we held that a complaint alleging a constitutional tort stated facts sufficient to support a claim for punitive damages. In so holding we carefully analyzed our prior decisions respecting punitive damages beginning with *Day* and continuing through *Prentice.* We repeated and applied the "well-settled" rule contained in those cases: "Damages have been defined to be the compensation which the law will award for an injury done, and are said to be exemplary and allowable in excess of the actual loss, where a tort is aggravated by *evil motive, actual malice, deliberate violence or oppression.*" 165 U. S., at 86 (emphasis added). The point could not be clearer. The Court today fashions a federal standard for punitive damages, see 42 U. S. C. § 1988 (1976 ed., Supp. V), yet steadfastly refuses to follow those of our decisions speaking to that point. If it did, it would adopt a standard requiring "evil motive, actual malice, deliberate violence or oppression." *Ibid.*

In addition, the decisions rendered by state courts in the years preceding and immediately following the enactment of § 1983 attest to the fact that a solid majority of jurisdictions took the view that the standard for an award of punitive dam-

---

[9] The Court does not attempt to explain the unequivocal and repeated statements in *Prentice* regarding the necessity of showing "guilty intention." It relies instead on the Court's quotation from a state case that observed in passing that punitive damages have been assessed on "evidence of such willfullness, recklessness or wickedness . . . as amounted to criminality." 147 U. S., at 115. Not only is this statement at best ambiguous, but the Court mentioned the state case only in its discussion of principles of *respondeat superior,* not in its earlier discussion of the standard for punitive damages.

ages included a requirement of ill will.[10]  To be sure, a few jurisdictions followed a broader standard; a careful review of the decisions at the time uncovers a number of decisions

---

[10] Legal treatises in use in the 1870's do not support the majority's assertion that punitive damages could be awarded on a showing of gross negligence, recklessness, or serious indifference to the rights of others.  Instead, they support the rather unsurprising proposition that among the courts of the several States in the late 1870's, several views regarding punitive damages had evolved.  Addison's Treatise on the Law of Torts says "in all cases of *malicious injuries and trespasses accompanied by personal insult, or oppressive and cruel conduct,* juries are told to give what are called exemplary damages." 2 C. Addison, Law of Torts 645 (1876) (emphasis added).  The treatise continues: "Wherever the wrong or injury is of a grievous nature, done with a high hand, or is accompanied with deliberate intention to injure, or with words of contumely and abuse, and by circumstances of aggravation, the jury" may award punitive damages. *Ibid.*  In a footnote Addison indicates that "malice" has been interpreted in several ways, including "an intention to set at defiance the legal rights of others," "wantonness or a willful disregard of the rights of others," "such a wanton character that it might properly be said to be willful," and "a disregard for the rights of others." *Id.,* at 646–647, n. 1.  Plainly, as discussed in greater detail below, different States applied different rules, and that is all the treatise writer purported to say.

A similar pattern is followed in other hornbooks popular at the time.  The authors make reference to some decisions articulating an actual-ill-will standard, while citing as well to decisions accepting a recklessness rule.  Compare J. Deering, Law of Negligence § 415, text accompanying n. 1 (1886), with *id.,* at text accompanying n. 7; G. Field, Law of Damages § 78 (1876) ("The rule we have furnished not only requires that the act done should be injurious, and that actual loss be sustained thereby to the plaintiff, but also that it be willfully injurious.  The *animus* of the wrongdoer is an important question to be considered in such cases, as it is in criminal cases.  The wrong must be intended, and the result of a spirit of mischief, wantonness, or of criminal indifference to civil obligations, or the rights of others, from which malice may well be inferred"), with *id.,* § 84, at 91, n. 4 (gross negligence applied in an Iowa case); F. Hilliard, Law of Remedies for Torts 598–599 (2d ed. 1873) (detailing different standards prevailing); 2 S. Thompson, Law of Negligence 1264–1265 (1880) (noting conflicting views regarding intent requirement).

Moreover, Professor Greenleaf, one of the most respected legal commentators of his time, entirely denied the existence of any doctrine of punitive

that contain some reference to "recklessness." And equally clearly, in more recent years many courts have adopted a standard including "recklessness" as the minimal degree of culpability warranting punitive damages.[11]

Most clear of all, however, is the fact that at about the time § 1983 was enacted a considerable number of the 37 States

---

damages. 2 S. Greenleaf, Law of Evidence § 253 (15th ed. 1892). While his view has prevailed in a substantial minority of American jurisdictions, see *supra*, in many States it concededly has not been followed. Its importance for our purposes, however, lies in the fact that it was the considered judgment of a respected scholar, published and available at the time § 1983 was enacted. Likewise, in 1 J. Sutherland, Law of Damages (1882), the author notes that "bad motive" is necessary for an award of punitive damages, while permitting such a motive to be inferred from proof of negligent or reckless conduct. *Id.*, at 716, 724. Similarly, Judge Mayne's Treatise on Damages, indicated that the applicable standard for an award of punitive damages required some sort of improper motive. J. Mayne, Law of Damages 41 (1856).

[11] See the cases cited by the Court, *ante*, at 48, n. 13. In this regard, it is useful to consider a position commonly held in 1871, and not infrequently followed today. A number of States adhered to the requirement that actual ill will towards a victim was the standard for punitive damages, but permitted jurors to infer this mental state from the character of the tortfeasor's conduct. *E. g.*, *Malone* v. *Murphy*, 2 Kan. 250, 263 (1864) (jury "may infer malice from want of probable cause, but they are not bound so to infer it"); *Lyon* v. *Hancock*, 35 Cal. 372, 376 (1868) ("Malice . . . is generally to be inferred from facts and circumstances"); *Farwell* v. *Warren*, 51 Ill. 467, 472 (1869) ("actuated by malice" which may be inferred from "wanton, willful or reckless disregard"); *Addair* v. *Huffman*, 156 W. Va. 592, 195 S. E. 2d 739 (1973); *Columbus Finance, Inc.* v. *Howard*, 42 Ohio St. 2d 178, 327 N. E. 2d 654 (1975). As one lower court described it, "fraud, oppression or malice" are necessary to recover punitive damages, but these elements "may be inferred from acts constituting such gross negligence as to warrant the inference of or be deemed equivalent to an evil intent." *Schuman* v. *Chatman*, 184 Okla. 224, 227, 86 P. 2d 615, 618 (1938). It is important to appreciate, however, that there is a fundamental distinction between the *standard* for punitive damages and the *evidence the jury may rely upon in meeting that standard*. To say that reckless behavior may, with other evidence, permit the jury to infer a particular mental state, is not to say, as the Court does, that reckless behavior alone satisfies the punitive damages claimant's standard of proof.

then belonging to the Union required some showing of wrongful intent before punitive damages could be awarded.[12] As the cases set out in the margin reveal, it is but a state-

---

[12] See,, e. g., *Roberts* v. *Heim,* 27 Ala. 678, 683 (1855) ("the law allows [punitive damages] whenever the trespass is committed in a rude, aggravating, or insulting manner, as malice may be inferred from these circumstances"); *Brewer* v. *Watson,* 65 Ala., at 96–97 ("it is clear . . . that where [a public] officer acts in good faith, he is not liable to exemplary damages"; "there can clearly be no recovery of exemplary . . . damages, without proof of" acts committed "maliciously, and with intent to injure"); *Hays* v. *Anderson,* 57 Ala., at 378; *Barlow* v. *Lowder,* 35 Ark., at 496 (instruction that "exemplary damages [are] allowed as a punishment for torts committed with fraud, actual malice, or deliberate violence or oppression" held a "textbook principle"); *Kelly* v. *McDonald,* 39 Ark., at 393 ("Exemplary damages ought not to be given, unless in cases of intentional violation of another's right, or when a proper act is done with an excess of force or violence, or with a malicious intent to injure another in his person or property"); *Ward* v. *Blackwood,* 41 Ark. 295, 299–301 (1883) (emphasis added) (punitive damages denied because "there was no evidence of previous malice, nor of deliberate cruelty, only of hot blood and a *certain recklessness*"; charge requiring "a wanton and willful manner, and under circumstance of outrage, cruelty and oppression, or with malice" approved); *Dorsey* v. *Manlove,* 14 Cal. 553, 558 (1860) (holding that absence of "bad faith," "wanton or malicious motives," or "willfully unjust or oppressive" conduct barred punitive damages; reference in dicta to "reckless disregard" not applied); *Nightingale* v. *Scannell,* 18 Cal. 315, 325 (1861); *Lyon* v. *Hancock, supra; Davis* v. *Hearst,* 160 Cal., at 163–164, 116 P., at 539–540 ("malice of evil motive" necessary to recover punitive damages in California); *Doroszka* v. *Lavine,* 111 Conn. 575, 150 A. 692 (1930) (reviewing cases limiting punitive damages to amount of attorney's fees); *Dibble* v. *Morris,* 26 Conn. 416, 426–427 (1857) ("settled" that jury can award "vindictive [damages] in proportion to the degree of malice or wantonness evinced by the defendant"); *Welch* v. *Durand,* 36 Conn. 182 (1869) (special rule for ultrahazardous activities); *Dalton* v. *Beers,* 38 Conn. 529 (1871); *Huber* v. *Teuber,* 10 D. C., at 489–491 (punitive damages "are sometimes allowable . . . as punishment of a quasi-criminal character for the wantonness and malice which inspired the wrong of the defendant"; "malignant motives" and "improper motive" required); *Yahoola River Mining Co.* v. *Irby,* 40 Ga. 479, 482 (1869) (*"bona fide* belief" by defendant that he was acting lawfully bars punitive damages); *Green* v. *Southern Express Co.,* 41 Ga. 515 (1871) (jury charge requiring "a desire to injure the accused" approved);

ment of the obvious that "evil motive" was the general standard for punitive damages in many States at the time of the 42d Congress.

---

*Coleman & Newsome* v. *Ryan*, 58 Ga., at 134, 135 (instruction that jury might award "vindictive damages, if they believed that the conduct of [the defendant] was malicious, and for the purpose of breaking up plaintiff's business"); *Jeffersonville R. Co.* v. *Rogers*, 38 Ind., at 124–125 (charge requiring "the spirit of oppressive malice or wantonness" approved); *Móore* v. *Crose*, 43 Ind. 30, 34–35 (1873) (punitive damages award reversed since "[t]here [were] no elements of malice, insult, or deliberate oppression in the case . . . [and] appellant was acting under the belief that he had a valid right"); *Thomas* v. *Isett*, 1 Greene 470, 475 (Iowa 1848) ("wanton, rude, and aggravating manner, indicating malice or a desire to injure," needed for punitive damages); *Frink & Co.* v. *Coe*, 4 Greene 555, 559 (Iowa 1854) (special rule for common carriers); *Brown* v. *Allen*, 35 Iowa 306, 311 (1872) (instruction that malice-in-law would support punitive damages reversed; "This was clearly erroneous. It is an abrogation of the distinction between a simple trespass and its consequences, and a malicious one justifying exemplary damages. A simple trespass, because unlawful, might be, under the instruction, visited with punitive damages, however honestly the defendants may have believed they had the lawful right to take possession of the property in question"); *Fuller* v. *Chicago & N. W. R. Co.*, 31 Iowa 187, 204 (1871); *Curl* v. *Chicago, R. I. & P. R. Co.*, 63 Iowa, at 428–429, 19 N. W. 308 (instruction permitting punitive damages if defendant "willfully used unnecessary force" held improper: "This instruction is erroneous in that it does not make the recovery of exemplary damages dependent upon malice of the wrong doer. It holds that the willful use of unnecessary force is a ground for allowing exemplary damages. An act willfully done may not be accompanied by malice, *that is, a spirit of enmity, malevolence or ill will, with a desire to harm and a disposition to injure*"); *Inman* v. *Ball*, 65 Iowa, at 465, 22 N. W., at 668 (Rothrock, J.) ("To warrant a jury in inflicting damages by way of punishment, it should appear that the act complained of was a willful or malicious wrong. *There must be a purpose or intent to harass, oppress, or injure another. This is a very different state of mind and purpose from that of a person who has no more than good reason to believe his act is wrongful*"); *Wentworth* v. *Blackman*, 71 Iowa 255, 256–257, 32 N. W. 311, 311–312 (1887) (Rothrock, J.) (reversing award of punitive damages; "malicious act," which demands inquiry into defendant's "motives," required); *Cameron* v. *Bryan*, 89 Iowa 214, 56 N. W. 434 (1893) (Rothrock, J.) ("willful and malicious" conduct necessary); *Stinson* v. *Buisson*, 17 La. 567, 572 (1841) ("redress in damages should . . .

In short, a careful examination of the decisions available to
the Members of the 42d Congress reveals a portrait different
in important respects from that painted by the Court.    While

be proportioned to the injury sustained, unless it be where they are given
as an example to deter others from similar conduct in future, and really for
the purpose of punishing men for their bad motives and intentions"); *Biggs*
v. *D'Aquin Bros.*, 13 La. Ann. 21, 22 (1858) (no punitive damages award-
able against party acting in "good faith"); *Wilkinson* v. *Drew*, 75 Me., at
363 (while punitive damages are recoverable "in case as well as trespass,"
to recover them jury must find "that the act or omission of the defendant
was willful and wanton," with "wantonly" explicitly defined as "indicating
wicked intent"); *Pike* v. *Dilling*, 48 Me., at 543 (court approves instruction
that punitive damages are awardable if defendant acted "wantonly," quot-
ing statement requiring that defendant acted " 'under the influence of ac-
tual malice, or with the intention to injure the plaintiff' "); *Schindel* v.
*Schindel*, 12 Md. 108, 122–123 (1858) ("The man who, from bad and mali-
cious intentions, commits a trespass, ought, in justice, to be dealt with
more harshly than one who acts from no vicious feelings, but ignorantly");
*Baltimore & Ohio R. Co.* v. *Blocher*, 27 Md. 277, 287 (1867); *Zimmerman*
v. *Helser*, 32 Md. 274, 278 (1869) (no punitive damages unless the defend-
ant acts by "mere *pretence* for the purpose of perpetrating a wrong");
*Friend* v. *Hamill*, 34 Md. 298, 304–307, 314 (1870) ("malice, ill-will or cor-
ruption" necessary for punitive damages); *Ellis* v. *Brockton Publishing
Co.*, 198 Mass. 538, 542, 84 N. E. 1018, 1019 (1908) (punitive damages have
not been and are not recoverable); *Hyatt* v. *Adams*, 16 Mich. 180, 198–199
(1867) (refusal to charge that "if from the evidence no evil motive be im-
puted to the defendant, then the rule of compensation is fixed by law, and
. . . exemplary damages are not allowable," reversed); *Goetz* v. *Ambs*, 27
Mo. 28, 32–33 (1858) ("[I]ntention . . . only becomes material in considering
the question of exemplary damages.   If the injury is not intentional, but
results simply from a want of proper care, nothing more should be recov-
ered than will compensate for the actual damage. . . . [But if] wilfulness—a
wrongful act, done intentionally . . ." exists, punitive damages are avail-
able); *McKeon* v. *Citizens' R. Co.*, 42 Mo. 79, 87 (1867) (neither reckless-
ness nor gross negligence supports punitive damages, which "can be given,
if ever in a civil case, only in cases where the injury is intentionally, will-
fully, and maliciously done"); *Lynd* v. *Picket*, 7 Minn., at 201 (instruc-
tion that if defendants, knowing plaintiff's property "to be exempt, wilfully
and maliciously attached [it with] the purpose of harassing and oppress-
ing" him, then punitive damages are awardable explicitly approved as in-
dicating "the facts necessary to be proved in order to justify [the jury] in

a few jurisdictions may have adopted a more lenient, if less precise, standard of recklessness, the majority's claim that the prevailing standard in 1871 was one of recklessness sim-

---

giving exemplary damages"; "malice" includes acts defendant "know[s]" are "wrong and unlawful"); *Carli* v. *Union Depot, Street R. & T. Co.*, 32 Minn., at 104, 20 N. W., at 90 (punitive damages "properly awarded only where the trespass appears to have been wanton, willful, or malicious,—a *conscious* violation of the [plaintiff's] rights"); *Whitfield* v. *Whitfield*, 40 Miss. 352, 366–367 (1866) (punitive damages require "malice, fraud, oppression, or wilful wrong"; no punitive damages if defendant "acts in good faith, and with no intent injuriously to affect plaintiff's rights"); *Memphis & Charleston R. Co.* v. *Whitfield*, 44 Miss. 466, 488 (1870) (actual-intent rule "modified somewhat in . . . application, particularly to passenger carriers by steam"); *Fay* v. *Parker*, 53 N. H. 342 (1872) (no prior decision adopts rule of punitive damages; doctrine rejected entirely); *Winter* v. *Peterson*, 24 N. J. L., at 529 (if official acted "not only . . . without authority, but maliciously, he was liable to exemplary damages"; "maliciously" means "from improper motives"); *Haines* v. *Schultz*, 50 N. J. L. 481, 484–485, 14 A. 488–489 (1888) (punitive damages "res[t] primarily on a single ground—wrongful motive. . . . [I]t is the wrongful personal intention to injure that calls forth the penalty"; "punitive damages res[t] upon a wrongful motive of the defendant"); *King* v. *Patterson*, 49 N. J. L. 417, 419–420, 9 A. 705, 706 (1887) (while "malice" may not always mean actual ill will, when awarding punitive damages "malicious motive was required"); *Causee* v. *Anders*, 20 N. C., at 248 (punitive damages proper where defendant was "actuated by malice and a total disregard of the laws"); *Louder* v. *Hinson*, 49 N. C. 369, 371 (1857) (charge requiring desire "to wreak their vengeance" on the plaintiffs and "harass and insult them" approved); *Roberts* v. *Mason*, 10 Ohio St. 277, 279–280 (1859); *Simpson* v. *McCaffrey*, 13 Ohio 508, 522 (1884) (punitive damages available "for the wicked, corrupt, and malignant motive and design, which prompted [the guilty party] to the wrongful act"); *Rayner* v. *Kinney*, 14 Ohio St. 283, 287 (1863) (exemplary damages are "a punishment which should only attach to a wrongful intention. [W]here no wrongful intention is found, there is no just ground for the punishment of the defendant"); *Barnett* v. *Reed*, 51 Pa., at 191, 196 (instruction that, absent "actual malice or design to injure, the rule is compensatory damages; but where actual malice exists, a formed design to injure and oppress, the jury may give vindictive damages," termed "unexceptionable"); *M'Cabe* v. *Morehead*, 1 Watts & Serg. 513, 516 (Pa. 1841); *Herdic* v. *Young*, 55 Pa. 176, 177 (1867); *McDevitt* v. *Vial*, 7 Sadler 585, 590, 11 A. 645, 648–649 (Pa. 1887) (charge requiring "a high handed spirit, and a dis-

ply cannot be sustained. The decisions of this Court, which were likely well known to federal legislators, supported an *animus* requirement. As we said in *Day* v. *Woodworth*, 13

position to oppress and do wrong" approved); *Herreshoff* v. *Tripp*, 15 R. I. 92, 94, 23 A. 104, 105 (1885) (punitive damages "only when the defendant has acted maliciously or in bad faith"); *Windham* v. *Rhame*, 11 S. C. L., at 285–287 (where evidence "show[s] a malicious motive . . . damages may be awarded not only to recompense the plaintiff but to punish the defendant"; jury must "ascertain if the act be the result of accident or negligence, or of deliberate and evil purpose," and in latter instance, where injury results from "malfeasance," "an amount beyond the pecuniary loss should be given, by way of punishment"; "motive," "malicious purpose," and "intention" dispositive; statement that punitive damages require showing that defendant "malevolently with a view to harass, vex and insult the plaintiff" quoted with approval); *Cole* v. *Tucker*, 6 Tex. 266, 268 (1851) (punitive damages if "fraud, malice, or wilful wrong" or "a desire to injure" exist); *Neill* v. *Newton*, 24 Tex. 202, 204 (1859) (failure to allege "aggravated circumstances of misrepresentation and deception" bars punitive damages); *Bradshaw* v. *Buchanan*, 50 Tex. 492, 494 (1878) (punitive damages award reversed because "there is no evidence tending to show that appellants were actuated by malice . . . or that they [acted] wantonly, or with the intent to vex, harass, injure, or oppress him. On the contrary, the evidence strongly tends to show that they were actuated by no such motive"); *Parsons* v. *Harper*, 57 Va. 64, 78 (1860) (dictum; if an "act were done without malice, the party might not be liable to exemplary and vindictive damages"); *Virginia Railway & Power Co.* v. *House*, 148 Va. 879, 886, 193 S. E. 480, 482 (1927) ("well settled" law requires reversing punitive damages award because "there was no evidence of "any malicious or willful wrong"); *Borland* v. *Barrett*, 76 Va. 128 (1882) (punitive damages no different from compensatory damages in Virginia); *Devine* v. *Rand*, 38 Vt., at 626 (emphasis added) (Since punitive damages "depen[d] *entirely* upon the character and purpose of the defendant's acts, the usual evidence must be admissible to ascertain the disposition and intention which prompted them"; punitive damages depend on "wickedness and wilfullness"); *Lombard* v. *Batchelder*, 58 Vt. 558, 559–560, 5 A. 511, 512 (1886) ("malicious," "improper," and "evil" motive necessary); *Boutwell* v. *Marr*, 71 Vt., at 11, 42 A., at 610 ("wanton desire to injure"); *Earl* v. *Tupper*, 45 Vt. 275, 287–288 (1873) (after discussing rule in some States, court holds that punitive damages are "to be governed wholly by the malice or wantonness of the defendant"); *Hoadley* v. *Watson*, 45 Vt. 289, 292 (1873) (punitive damages available "on account of the bad spirit and wrong intention of the

How. 363 (1852), and *Philadelphia, W. & B. R. Co.* v. *Quigley*, 21 How. 202 (1859), a "spirit of mischief" was necessary for an award of punitive damages.   Among the States,

---

defendant"); *Boardman* v. *Goldsmith*, 48 Vt., at 407, 411 (instruction requiring that defendant "acted with express malice, intending to injure or disgrace the plaintiff" approved); *Ogg* v. *Murdock*, 25 W. Va., at 146–147 (approves, as "correct rule," statement "when . . . there is no actual malice or design to injure, the rule is to allow compensatory damages; but when actual malice exists, a formed design to injure and oppress, the jury may give vindictive damages"; holds "there being no proof of an intent to injure and oppress the plaintiff, the jury were not authorized to find that the defendant was actuated by malice and consequently they were not justified in giving vindictive damages"); *McWilliams* v. *Bragg*, 3 Wis. 424, 431 (1854) ("where . . . injury is inflicted under circumstances of aggravation, insult or cruelty, with vindictiveness and malice" punitive damages available); *Barnes* v. *Martin*, 15 Wis. *240, *245 (1862) (punitive damages not awardable "unless the jury should find that the acts [of the defendant] were without apparent cause, and proceeded from wanton or malicious motives"); *Morely* v. *Dunbar*, 24 Wis. 183, 186–187 (1869) (charge requiring "aggravation, insult, or cruelty, with vindictiveness or malice" approved; "malice" and "motive" are basis for punitive damages); *Hooker* v. *Newton*, 24 Wis. 292, 293 (1869) (approving charge requiring malice and intent to injure); *Hamlin* v. *Spaulding*, 27 Wis. 360, 364 (1870) (defendant must act "in bad faith, and, if not with actual malice, at least for the purpose of serving some ulterior object outside of the administration of criminal justice"); *Pickett* v. *Crook*, 20 Wis. 358 (1866) (not followed outside context of failure to control vicious animals); *Topolewski* v. *Plankinton Packing Co.*, 143 Wis. 52, 70, 126 N. W. 554, 560 (1910) ("the court has uniformly held that punitory damages are not allowable at all without the element of malice[;] the defendant [must have] acted with bad intent of some sort").

The Court's treatment of law prevailing in 1871 relies principally upon state-court decisions from the 1880's and 1890's.   These cases are admittedly somewhat more relevant to what the 42d Congress intended than the 20th-century cases cited by the Court; particularly if they explain prior decisions, these cases may reflect a well-settled understanding in a particular jurisdiction of the law regarding punitive damages.   Yet, decisions handed down well after 1871 are considerably *less* probative of legislative intent than decisions rendered before or shortly subsequent to the enactment of § 1983: it requires no detailed discussion to demonstrate that a Member of the 42d Congress would have been more influenced by a decision from 1870 than by one from the 1890's.   Accordingly, the bulk of the cases cited by

there were many approaches to the imposition of punitive damages, with a variety of standards prevailing throughout the Nation. Nonetheless, a solid majority of jurisdictions followed the rule that punitive damages require some element of "evil motive," "wickedness," or "formed design to injure and oppress." Thus, if we are to adhere to the principle, consistently followed in our previous decisions, that the Members of the 42d Congress intended § 1983 to reflect existing common-law rules, it is very likely that wrongful *animus* was a prerequisite for an award of punitive damages.

## IV

Even apart from this historical background, I am persuaded by a variety of additional factors that the 42d Congress intended a "wrongful intent" requirement. As mentioned above, punitive damages are not, and never have been, a favored remedy. In determining whether Congress, not bound by *stare decisis*,[13] would have embraced this often-condemned doctrine, it is worth considering the judgment of one of the most respected commentators in the field regarding the desirability of a legislatively enacted punitive damages remedy: "It is probable that, in the framing of a model code of damages to-day for use in a country unhampered by

the Court must be ignored; they simply illustrate the historical shift in legal doctrine, pointed out in text, from an actual-intent standard to a recklessness standard. If the Court is serious in its attention to 19th-century law, analysis must focus on the common law as it stood at the time of the 42d Congress. Here, notwithstanding the Court's numerous attempts to explain why decisions do not mean what they plainly say, it remains clear that in a majority of jurisdictions actual malice was required in order to recover punitive damages.

[13] In 1864 the Kansas Supreme Court, although bound by prior precedent, agreed with Professor Greenleaf's condemnation of punitive damages, see n. 10, *supra*, and said "were the question an open one, we should be inclined to [compensation only]." *Malone* v. *Murphy*, 2 Kan., at 261. See also *Sullivan* v. *Oregon Railway & Navigation Co.*, 12 Ore. 392, 7 P. 508 (1885).

legal tradition, the doctrine of exemplary damages would find no place." C. McCormick, Law of Damages 276 (1935).

In deciding whether Congress heeded such advice, it is useful to consider the language of § 1983 itself—which should, of course, be the starting point for any inquiry into legislative intent. Section 1983 provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party *injured* in an action at law, suit in equity, or other proper proceeding *for redress*" (emphasis added).

Plainly, the statutory language itself provides absolutely no support for the cause of action for punitive damages that the Court reads into the provision. Indeed, it merely creates "liab[ility] to the party injured . . . for redress." "Redress" means "[r]eparation of, satisfaction or compensation for, a wrong sustained or the loss resulting from this." 8 Oxford English Dictionary 310 (1933). And, as the Court concedes, punitive damages are not "reparation" or "compensation"; their very purpose is to punish, not to compensate. If Congress meant to create a right to recover punitive damages, then it chose singularly inappropriate words: both the reference to injured parties and to redress suggests compensation, and not punishment.

Other statutes roughly contemporaneous with § 1983 illustrate that if Congress wanted to subject persons to a punitive damages remedy, it did so explicitly. For example, in § 59, 16 Stat. 207, Congress created express punitive damages remedies for various types of commercial misconduct. Likewise, the False Claims Act, § 5, 12 Stat. 698, provided a civil remedy of double damages and a $2,000 civil forfeiture penalty for certain misstatements to the Government. As one

Court of Appeals has remarked: "Where Congress has intended [to create a right to punitive damages] it has found no difficulty in using language appropriate to that end." *United Mine Workers* v. *Patton*, 211 F. 2d 742, 749 (CA4 1954). And yet, in § 1983 one searches in vain for some hint of such a remedy.[14]

In the light of the foregoing indications, it is accurate to say that the foundation upon which the right to punitive damages under § 1983 rests is precarious, at the best. Given the extraordinary diffidence and obliqueness with which the right was granted—if it was—it seems more than a little unusual to read that grant as incorporating the most expansive of the available views as to the standard for punitive damages. Given the legislative ambiguity, the sensible approach to the problem would be an honest recognition that, if we are to infer a right to punitive damages, it should be a restrained one, reflecting the Legislature's approach in creating the right. And surely, the right ought to be limited by the view of punitive damages that the Members of the 42d Congress would have had—not by what some state courts have done a century later.

An intent requirement, unlike a recklessness standard, is logically consistent with the underlying justification for *punitive* damages. It is a fundamental principle of American law that penal consequences generally ought to be imposed only where there has been some sort of wrongful *animus* creating

---

[14] I agree with the Court's conclusion that the Act of May 31, 1870, § 2, 16 Stat. 140, is "revealing." That statute, like § 1983, was a Reconstruction civil rights statute. It created a private cause of action for persons suffering from racial discrimination in voting registration, and explicitly allowed recovery of a $500 civil penalty by the person aggrieved. Similar provision for recovery of punitive damages is conspicuously absent from § 1983. Likewise, the Act clearly conditions the award of damages on a knowing violation of the civil rights laws. It is difficult to see what comfort the Court derives from the section. It merely demonstrates that when Congress wished to impose punitive damages on a party, it did so explicitly, and, even then, required more than recklessness.

the type of culpability warranting this treatment. As we said in *Morissette* v. *United States*, 342 U. S. 246, 250–251 (1952): "A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory 'But I didn't mean to.'" This principle "is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." *Id.*, at 250. Indeed, as indicated previously, 19th-century decisions consistently justified the imposition of a quasi-criminal "fine" by reference to the "wickedness" or "evil" conduct of the defendant, just as Oliver Wendell Holmes drew a sharp distinction between accidentally and intentionally kicking an animal. Given that punitive damages are meant to punish, it is difficult to believe that Congress would have departed from the "instinctive," "universal and persistent" linkage in our law between punishment and wrongful intent.

## V

Finally, even if the evidence of congressional intent were less clearcut, I would be persuaded to resolve any ambiguity in favor of an actual-malice standard. It scarcely needs repeating that punitive damages are not a "favorite of the law," see *supra*, at 58, owing to the numerous persuasive criticisms that have been leveled against the doctrine. The majority reasons that these arguments apply to all awards of punitive damages, not just to those under § 1983; while this is of course correct, it does little to reduce the strength of the arguments, and, if they are persuasive, we should not blindly follow the mistakes other courts have made.

Much of what has been said above regarding the failings of a punitive damages remedy is equally appropriate here. It is anomalous, and counter to deep-rooted legal principles and common-sense notions, to punish persons who meant no harm, and to award a windfall, in the form of punitive damages, to someone who already has been fully compen-

sated. These peculiarities ought to be carefully limited—not expanded to every case where a jury may think a defendant was too careless, particularly where a vaguely defined, elastic standard like "reckless indifference" gives free reign to the biases and prejudices of juries. In short, there are persuasive reasons not to create a new punitive damages remedy unless it is clear that Congress so intended.

This argument is particularly powerful in a case like this, where the uncertainty resulting from largely random awards of punitive damages will have serious effects upon the performance by state and local officers of their official duties.[15] One of the principal themes of our immunity decisions is that the threat of liability must not deter an official's "willingness to execute his office with the decisiveness and the judgment required by the public good." *Scheuer* v. *Rhodes*, 416 U. S. 232, 240 (1974). To avoid stifling the types of initiative and decisiveness necessary for the "government to govern," *Dalehite* v. *United States*, 346 U. S. 15, 57 (1953) (Jackson, J., dissenting), we have held that officials will be liable for compensatory damages only for certain types of conduct. Precisely the same reasoning applies to liability for punitive damages. Because punitive damages generally are not subject to any relation to actual harm suffered, and because the recklessness standard is so imprecise, the remedy poses an even greater threat to the ability of officials to take decisive, efficient action. After the Court's decision, governmental officials will be subjected to the possibility of damages awards unlimited by any harm they may have caused or the fact they acted with unquestioned good faith: when swift action is demanded, their thoughts likely will be on personal financial consequences that may result from their conduct—but whose limits they cannot predict—and not upon their

---

[15] This is not a new concern, see, *e. g., Brewer* v. *Watson*, 65 Ala., at 96–97 (absent an actual-malice standard for punitive damages "few men, fit for such positions, could be induced to accept public trusts of this character").

official duties.   It would have been difficult for the Court to have fashioned a more effective Damoclean sword than the open-ended, standardless, and unpredictable liability it creates today.[16]

Moreover, notwithstanding the Court's inability to discern them, there are important distinctions between a right to

---

[16] The Court relies all but exclusively on the notion that a recklessness standard for punitive damages is necessary to deter unconstitutional conduct by state officials.   The issue is a little more complicated.   The deterrence the Court pursues necessarily is accompanied by costs: as our decisions regarding common-law immunities explicitly recognize, see cases cited in n. 6, *supra*, the imposition of personal liability on officials gravely threatens their initiative and judgment, and scarcely serves to make public positions attractive to competent, responsible persons.   While constitutional rights are high on our scale of values, so is an effective performance of the countless basic functions that modern governments increasingly have come to perform.   In fashioning a punitive damages standard we should seek to achieve that level of deterrence that is most worth the costs it imposes.

The Court, however, simply ignores the potential costs of the standard it embraces.   This single-minded desire to deter unconstitutional official actions would not logically stop at recklessness; awarding punitive damages on the basis of mere negligence, or on a strict liability basis, might result, in the short term, in even less unconstitutional conduct.   Yet, just as with the Court's recklessness standard, this deterrence would come at too costly a price.   The Court is unable to give any reason, related to achieving deterrence at a cost sensibly related to benefits obtained, for its choice of a recklessness standard.   It offers no response to the obvious distinctions between the standard for punitive damages in state-law tort actions and that in § 1983 actions, where § 1988 provides attorney's fees and where issues of federalism are involved.   It does not even attempt to discuss the plainly relevant question whether insurance may be obtained against punitive damages awards.

While fully recognizing that the issue is a complex one, in my judgment the dangers that accompany the vague recklessness standard adopted by the Court far outweigh the deterrence achieved thereby.   Recklessness too easily shades into negligence, particularly when the defendant is an unpopular official—whether because of his official actions, or for more invidious reasons.   Punitive damages are not bound by a measure of actual damages, so when a jury does act improperly, the harm it may occasion can be great.   These threats occur in an area—the provision of governmental

damages under § 1983 and a similar right under state tort law. A leading rationale seized upon by proponents of punitive damages to justify the doctrine is that "the award is . . . a covert response to the legal system's overt refusal to provide financing for litigation." D. Dobbs, Law of Remedies 221 (1973); K. Redden, Punitive Damages § 2.4(C) (1980). Yet, 42 U. S. C. § 1988 (1976 ed., Supp. V) provides not just a "covert response" to plaintiffs' litigation expenses but an explicit provision for an award to the prevailing party in a § 1983 action of "a reasonable attorney's fee as part of the costs." By permitting punitive damages *as well as* attorney's fees, § 1983 plaintiffs, unlike state tort law plaintiffs, get not just one windfall but two—one for them, and one for their lawyer. This difference between the incentives that are present in state tort actions, and those in § 1983 actions, makes the Court's reliance upon the standard for punitive damages in the former entirely inapposite: in fashioning a new financial lure to litigate under § 1983 the Court does not act in a vacuum, but, by adding to existing incentives, creates an imbalance of inducements to litigate that may have serious consequences.[17]

---

services—where it is important to have efficient, competent public servants. I fear that the Court's decision poorly serves this goal, and that in the end, official conduct will be less useful to our citizens, not better.

[17] In this respect, Congress' attitude towards punitive damages as revealed by its treatment of the subject in the Civil Rights Act of 1968 is highly illuminating. There, in marked contrast to § 1983, Congress explicitly included a right to punitive damages; notably, however, that right was limited to recoveries of $1,000. 42 U. S. C. § 3612(c). While Congress may have thought punitive damages appropriate in some cases, it recognized the dangers that such a remedy creates—unfairness to defendants, stifling of initiative of state officials, comity concerns, and, perhaps most alarmingly, an open-ended incentive to litigate in a field where other such incentives already exist. See, *e. g.*, 42 U. S. C. § 1988 (1976 ed., Supp. V).

Petitioner did not argue, and the Court properly does not decide, whether the $1,000 limit in 42 U. S. C. § 3612(c), also should apply in actions under § 1983. It seems likely that it would. While the Court does not say so, its opinion seems to derive its punitive damages remedy from

The staggering effect of § 1983 claims upon the workload of the federal courts has been decried time and again. The torrent of frivolous claims under that section threatens to incapacitate the judicial system's resolution of claims where true injustice is involved; those claims which truly warrant redress are in a very real danger of being lost in a sea of meritless suits. Yet, apparently oblivious to this, the Court today reads into the silent, inhospitable terms of § 1983 a remedy that is designed to serve as a "bounty" to encourage private litigation. Dobbs, *supra*, at 221. In a time when the courts are flooded with suits that do not raise colorable claims, in large part because of the existing incentives for litigation under § 1983, it is regrettable that the Court should take upon itself, in apparent disregard for the likely intent of the 42d Congress, the legislative task of encouraging yet more litigation.[18] There is a limit to what the federal judicial system can bear.

---

"the laws of the United States," concluding *sub silentio* that they "are suitable to carry [§ 1983] into effect." 42 U. S. C. § 1988 (1976 ed., Supp. V). (This follows from the Court's apparent view that, for example, in one of the several States where punitive damages are not available, a § 1983 plaintiff could recover such damages, thus indicating that it is not "the common law . . . of the State wherein the court having jurisdiction of such civil or criminal cause is held," § 1988, that the Court is applying.) If, therefore, we are to apply a punitive damages remedy "in conformity with the laws of the United States," then the most relevant law is 42 U. S. C. § 3612(c), limiting punitive damages in certain civil rights actions to $1,000.

[18] The case is materially different from our decision in *Patsy* v. *Board of Regents*, 457 U. S. 496 (1982), where our previous decisions strongly suggested that exhaustion of state administrative remedies is not required under § 1983. Here, our previous statements as to the standard for a recovery of punitive damages are inconsistent with the Court's formulation. In *Carey* v. *Piphus*, 435 U. S., at 257, n. 11, we implied that the absence of "malicious intention" would preclude an award of punitive damages. And, as discussed above, the standard for punitive damages recoveries in constitutional tort actions was that the case involve "a tort . . . aggravated by evil motive, actual malice, deliberate violence or oppression." *Scott* v. *Donald*, 165 U. S. 58, 86 (1897).

Finally, by unquestioningly transferring the standard of punitive damages in *state* tort actions to *federal* § 1983 actions, the Court utterly fails to recognize the fundamental difference that exists between an award of punitive damages by a federal court, acting under § 1983, and a similar award by a state court acting under prevailing local laws. While state courts may choose to adopt such measures as they deem appropriate to punish officers of the jurisdiction in which they sit, the standards they choose to adopt can scarcely be taken as evidence of what it is appropriate for a federal court to do. See *Edelman* v. *Jordan,* 415 U. S. 651, 677, n. 19 (1974). When federal courts enforce punitive damages awards against local officials they intrude into sensitive areas of sovereignty of coordinate branches of our Nation, thus implicating the most basic values of our system of federalism. Moreover, by yet further distorting the incentives that exist for litigating claims against local officials in federal court, as opposed to state courts, the Court's decision makes it even more difficult for state courts to attempt to conform the conduct of state officials to the Constitution.

I dissent.

JUSTICE O'CONNOR, dissenting.

Although I agree with the result reached in JUSTICE REHNQUIST's dissent, I write separately because I cannot agree with the approach taken by either the Court or JUSTICE REHNQUIST. Both opinions engage in exhaustive, but ultimately unilluminating, exegesis of the common law of the availability of punitive damages in 1871. Although both the Court and JUSTICE REHNQUIST display admirable skills in legal research and analysis of great numbers of musty cases, the results do not significantly further the goal of the inquiry: to establish the intent of the 42d Congress. In interpreting § 1983, we have often looked to the common law as it existed in 1871, in the belief that, when Congress was silent on a point, it intended to adopt the principles of the common law with which it was familiar. See, *e. g., Newport* v. *Fact Con-*

*certs, Inc.*, 453 U. S. 247, 258 (1981); *Carey* v. *Piphus*, 435 U. S. 247, 255 (1978). This approach makes sense when there was a generally prevailing rule of common law, for then it is reasonable to assume that Congressmen were familiar with that rule and imagined that it would cover the cause of action that they were creating. But when a significant split in authority existed, it strains credulity to argue that Congress simply assumed that one view rather than the other would govern. Particularly in a case like this one, in which those interpreting the common law of 1871 must resort to dictionaries in an attempt to translate the language of the late 19th century into terms that judges of the late 20th century can understand, see *ante*, at 39–41, n. 8; 61–64, nn. 3, 4, and in an area in which the courts of the earlier period frequently used inexact and contradictory language, see *ante*, at 45–47, n. 12, we cannot safely infer anything about congressional intent from the divided contemporaneous judicial opinions. The battle of the string citations can have no winner.

Once it is established that the common law of 1871 provides us with no real guidance on this question, we should turn to the policies underlying § 1983 to determine which rule best accords with those policies. In *Fact Concerts*, we identified the purposes of § 1983 as pre-eminently to compensate victims of constitutional violations and to deter further violations. 453 U. S., at 268. See also *Robertson* v. *Wegmann*, 436 U. S. 584, 590–591 (1978); *Carey* v. *Piphus, supra*, at 254–257, and n. 9. The conceded availability of compensatory damages, particularly when coupled with the availability of attorney's fees under § 1988, completely fulfills the goal of compensation, leaving only deterrence to be served by awards of punitive damages. We must then confront the close question whether a standard permitting an award of unlimited punitive damages on the basis of recklessness will chill public officials in the performance of their duties more than it will deter violations of the Constitution, and whether the availability of punitive damages for reckless violations of the Constitution in addition to attorney's fees will create an

incentive to bring an ever-increasing flood of § 1983 claims, threatening the ability of the federal courts to handle those that are meritorious. Although I cannot concur in JUSTICE REHNQUIST's wholesale condemnation of awards of punitive damages in any context or with the suggestion that punitive damages should not be available even for intentional or malicious violations of constitutional rights, I do agree with the discussion in Part V of his opinion of the special problems of permitting awards of punitive damages for the recklessness of public officials. Since awards of compensatory damages and attorney's fees already provide significant deterrence, I am persuaded that the policies counseling against awarding punitive damages for the recklessness of public officials outweigh the desirability of any incremental deterrent effect that such awards may have. Consequently, I dissent.